No. 22-1251

IN THE

# United States Court of Appeals

FOR THE FOURTH CIRCUIT

MADISON CAWTHORN, an individual,

*Plaintiff-Appellee*,

v.

MR. DAMON CIRCOSTA, in his official capacity as Chair of the North Carolina State Board of Elections, MS. STELLA ANDERSON, in her official capacity as a member of the North Carolina State Board of Elections, MR. JEFF CARMON, in his official capacity as a member of the North Carolina State Board of Elections, MR. STACY EGGERS IV, in his official capacity as a member of the North Carolina State Board of Elections, MR. TOMMY TUCKER, in his official capacity as a member of the North Carolina State Board of Elections, MS. KAREN BRINSON BELL, in her official capacity as the Executive Director of the North Carolina State Board of Elections,

*Defendants, and*

BARBARA LYNN AMALFI, LAUREL ASHTON, NATALIE BARNES, CLAUDE BOISSON, MARY DEGREE, CAROL ANN HOARD, JUNE HOBBS, MARIE JACKSON, MICHAEL JACKSON, ANNE ROBINSON, DAVID ROBINSON, CAROL ROSE, and JAMES J. WALSH,

*Defendant-Intervenor-Appellants*.

On Appeal from the United States District Court for the Eastern District of North Carolina

## DEFENDANT-INTERVENOR-APPELLANTS' EMERGENCY MOTION FOR STAY OF INJUNCTION PENDING APPEAL

Pressly M. Millen
Raymond M. Bennett
Scott D. Anderson
Hayes Jernigan Finley
Womble Bond Dickinson (US) LLP
555 Fayetteville Street, Suite 1100
Raleigh, NC 27601
Office: 919.755.2135
Fax: 919.755.6067
Email: Press.Millen@wbd-us.com
        Ray.Bennett@wbd-us.com
        Scott.D.Anderson@wbd-us.com
        Hayes.Finley@wbd-us.com

John R. Wallace
Lauren T. Noyes
Post Office Box 12065
Raleigh, NC 27605
Office: 919.782.9322
Fax: 919.782.8133
Email: jrwallace@wallacenordan.com
        ltnoyes@wallacenordan.com

Robert F. Orr
3434 Edwards Mill Road, Suite 112-372
Raleigh, NC 27612
Office: 919.608.5335
Email: orr@rforrlaw.com

Ronald Fein
John C. Bonifaz
Ben Clements
Courtney Hostetler
Benjamin Horton
Free Speech For People
1320 Centre St. #405
Newton, MA 02459
Office: 617.244.0234
Email: rfein@freespeechforpeople.org

*Attorneys for Defendant-Intervenor-Appellants Barbara Lynn Amalfi, Laurel Ashton, Natalie Barnes, Claude Boisson, Mary Degree, Carol Ann Hoard, June Hobbs, Marie Jackson, Michael Jackson, Anne Robinson, David Robinson, Carol Rose, and James J. Walsh*

*Of Counsel*

James G. Exum, Jr. (State Bar #1392)
6 Gleneagle Ct.
Greensboro, NC 27408
Office: 336.554.1140
Email: jimxzoom@gmail.com

## **Table of Contents**

BACKGROUND ................................................................................1

REASONS FOR GRANTING THE RELIEF ....................................3

I.     The Challengers Are Proper Parties To Appeal The Preliminary
       Injunction And To Seek Its Stay.............................................3

II.    The Need For A Stay Is Exigent Given The Timing Of The North
       Carolina Primary.....................................................................6

III.   The Challengers Are Entitled To A Stay..................................8

       A.     The Challengers Have A Strong Merits Argument............................ 8

              1.     The District Court's Ruling Is Manifestly Wrong. ....................8

                     a.     The Amnesty Act of 1872 Did Not Forever Absolve All
                            Future Insurrectionists. ....................................... 8

       B.     The Remaining Factors Favor A Stay Pending Appeal. .................... 16

CONCLUSION.................................................................................18

LOCAL RULE 27(a) STATEMENT .................................................189

CERTIFICATE OF COMPLIANCE.................................................20

CERTIFICATE OF SERVICE .......................................................218

i

## Table of Authorities

**Cases**

*Gonzales v. Carhart*,
  550 U.S. 124, 153 (2007) ..................................................................14

*Hilton v. Braunskill*,
  481 U.S. 770 (1987) ..........................................................................8

*Mausolf v. Babbitt*,
  125 F.3d 661 (8th Cir. 1997)............................................................5

*Moore v. Harper*,
  no. 21A455 (U.S. Mar. 7, 2022)........................................................7

*Mova Pharm. Corp. v. Shalala*,
  140 F.3d 1060 (D.C. Cir. 1998) ........................................................4

*Nken v. Holder*,
  556 U.S. 418 (2009) ............................................................. 8, 16, 17

*NLRB v. Noel Canning*,
  573 U.S. 513, 524 (2014) ..................................................................13

*Rust v. Sullivan*,
  500 U.S. 173, 191 (1991) ..................................................................15

*Whitman v. Am. Trucking Ass'ns*,
  531 U.S. 457, 468 (2001) ..................................................................11

**Constitutional Provisions**

Fourteenth Amendment to the U.S. Constitution, Section 3 .......................... *passim*

**Statutes**

N.C. Gen. Stat. § 163-227.1 ...................................................................1

N.C. Gen. Stat. § 163-227.4(a)(4)............................................................6

N.C. Gen. Stat. § 163-227.10 (a) .............................................................7

52 U.S.C. § 20302(a)(8)(A) ...................................................................7

Act of May 22, 1872, ch. 193, 17 Stat. 142 (1872) ........................................ *passim*

Act to Admit the States of North Carolina [et al.], to Representation in
  Congress, 15 Stat. 73 (June 25, 1868)................................................16

Amnesty Act of June 6, 1898, ch. 389, 30 Stat. 432 .............................................12

## Other Authorities

*Cannon's Precedents of the House of Representatives of the United States*, ch. 157, §§ 56-59 (1936) ........................................................................12

6 *Cannon's Precedents of the House of Representatives of the United States*, ch. 157, at 55................................................................................................15

Cong. Globe, 39th Cong., 1st Sess. 2900 (1866)....................................................11

Cong. Globe, 39th Cong., 1st Sess. 2545 (1866)....................................................11

Cong. Res. Serv., "The Insurrection Bar to Office: Section 3 of the Fourteenth Amendment" (Jan. 29, 2021) ............................................13

Cong. Res. Serv. Rept., R41946, "Qualifications of Members of Congress" (Jan. 15, 2015) ................................................................................................... 13

William F. Duker, *The President's Power to Pardon: A Constitutional History*, 18 Wm. & Mary L. Rev. 475 (1977) .............................................................14

Gerard N. Magliocca, *Amnesty and Section Three of the Fourteenth Amendment*, 36 Const. Comm. 87, 111-20 (2021) ...............................................................11

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1, Barbara Lynn Amalfi, Laurel Ashton, Natalie Barnes, Claude Boisson, Mary Degree, Carol Ann Hoard, June Hobbs, Marie Jackson, Michael Jackson, Anne Robinson, David Robinson, Carol Rose, and James J. Walsh hereby notify the Court that they have no parent corporation and that no publicly held corporation owns any of their stock. No other publicly held corporation has a direct financial interest in the outcome of this litigation by reason of a franchise, lease, other profit-sharing agreement, insurance, or indemnity agreement.

**BACKGROUND**

Pursuant to Federal Rules of Appellate Procedure 8 and 27, Defendant-Intervenor-Appellants Barbara Lynn Amalfi, Laurel Ashton, Natalie Barnes, Claude Boisson, Mary Degree, Carol Ann Hoard, June Hobbs, Marie Jackson, Michael Jackson, Anne Robinson, David Robinson, Carol Rose, and James J. Walsh, respectfully request a stay of the district court's injunction which bars the voter challenge to Plaintiff-Appellee Madison Cawthorn's qualifications under Section 3 of the Fourteenth Amendment and Section 163.127.1, *et seq.*, of the North Carolina General Statutes.[1]

Section 3 of the Fourteenth Amendment to the Constitution, adopted in 1868, provides that persons who have taken an oath to support the Constitution who thereafter "shall have engaged in insurrection or rebellion" may not serve in Congress. That section also provided that "Congress may by a vote of two-thirds of each House, remove such disability."

On January 6, 2021, Plaintiff Madison Cawthorn, having taken the oath just days before as a new member of Congress, and having previously urged his followers to "lightly threaten" their Members of Congress, and (according to organizers) helped plan some of the day's events, exhorted the crowd at the so-called

---

[1] Given the timing exigencies of the May 17, 2022 primary election described below and the district court's denial of Defendant-Intervenor-Appellants' motion to intervene, which they have appealed, moving first for a stay in the district court would be impracticable. *See* F. R. App. P. 8(2)(i).

"March to Save America" to "go and fight in Washington DC" rather than "just sit idly by and sit on our hands." Cawthorn also pointed out to the crowd the distance and directions to the Capitol ("about two miles away down Pennsylvania Avenue").

Within hours, a massive crowd breached the Capitol in a violent insurrectionary effort to impede Congress from certifying the election in favor of President-Elect Biden.

Defendant-Intervenor-Appellants are North Carolina voters who filed a challenge to Cawthorn's qualifications under the Fourteenth Amendment and the North Carolina statute that gives district voters the right to challenge a candidate's qualifications (the "Challenge").[2] (Defendant-Intervenor-Appellants are referred to herein as the "Challengers.")

Before that process could even begin, however, Cawthorn filed an action in federal court seeking to enjoin the Challenge on the ground that the North Carolina statutory challenge provision was unconstitutional. On March 4, 2021, having first denied the Challengers' motion to intervene, the district court preliminarily enjoined the Challenge from going forward. That injunction, if not expeditiously stayed by this Court, will effectually put an end to the Challengers' ability to challenge Cawthorn, squelch their statutorily granted rights to challenge candidates'

---

[2] The Challenge to the Candidacy of Madison Cawthorn [ECF No. 2-3] is attached as Exhibit A to the Affidavit of Pressly M. Millen, sworn to March 9, 2022 ("Millen Aff."), and filed with this Motion.

qualifications before a neutral tribunal, and allow Cawthorn to appear on the May 17, 2022 North Carolina primary ballot without having to answer for his conduct leading up to and during January 6 insurrection.

The basis for the district court's ruling – that an 1872 general amnesty statute removed the disability not only for living ex-Confederates but also for all future insurrectionists, including those, like Cawthorn, yet unborn – requires torturing the statutory language, as well as ignoring basic logic, the statute's legislative history, Congress's own interpretation in applying Section 3 to a non-Confederate in 1919, and the Constitution itself.

In so ruling, moreover, the district court appears to have confused the "public interest" factor with the interests of the minority of "people [who] proceed to the ammunition box" when the courts refuse to rule in their favor. An injunction based on that dangerous proposition should be stayed.

## REASONS FOR GRANTING THE RELIEF

### I.   The Challengers Are Proper Parties To Appeal The Preliminary Injunction And To Seek Its Stay.

Notwithstanding the district court's denial of the motion to intervene, the Challengers are proper appellants to challenge the grant of preliminary injunction as well. Indeed, it is one of the Challengers – by virtue of her re-filing the Challenge against Cawthorn – who created the very "injury in fact" recognized by the district court. (*See* Rough Draft Transcript of the Hearing of March 4, 2022 ("Trans," attached to the Millen Aff. at Ex. B), at 51 ("The Court finds that the plaintiff has

3

demonstrated an injury in fact of challenge – new challenges have been filed that will be heard with a process that begins on March 7th.").).)[3]  The district court thus held that the issue of an injunction was "squarely before the Court because that is the objection that has been lodged to his candidacy by multiple people that he is seeking to have this Court enjoin." (*Id.*)

A non-party who timely moved to intervene, but was denied, may appeal both the denial of the motion to intervene *and* the grant of final relief that affects the denied intervenor's interests. *See Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1074-77 (D.C. Cir. 1998).  "If final judgment is entered with or after the denial of intervention, . . . the applicant should be permitted to file a protective notice of appeal as to the judgment, to become effective if the denial of intervention is reversed."  15A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3902.1 (2d ed. 1991, Apr. 2021 update).  "A contrary rule would prevent a prospective intervenor who successfully appeals the

---

[3] The original challenges (*see* Millen Aff., Ex. A), filed on January 10, 2021, by Challenger Ashton and others, were filed by residents of what was then North Carolina's 13th congressional district, where Cawthorn had filed as a candidate. After court-ordered redistricting, Cawthorn refiled in the revised 11th district. While most of the original Challengers do not live in the 11th district where Cawthorn is now running, proposed-intervenor Ashton does.  On March 2, 2022, Ashton and another voter in the 11th district filed a renewed challenge that, besides the change in congressional district, is otherwise materially identical to the original challenge.  (*See* ECF No. 70-1, Millen Aff., Ex. C.)  Thus, Ashton both moved to intervene below (before Cawthorn refiled) *and* filed the renewed challenge that gave rise to the district court's finding of injury in fact.

4

district court's denial of his intervention motion from securing the ultimate object of such motion." *Mausolf v. Babbitt*, 125 F.3d 661, 666 (8th Cir. 1997).

To be sure, the rule as typically stated applies to a "final judgment." However, in this rapidly-moving election-related case, the preliminary injunction is "the whole ball game," and has the same impact as a final judgment. It stopped the Challengers' state challenge, and had the same impact on their interests as any final judgment that the district court might issue months or years from now, long after the time for conducting election challenges has passed. Indeed, when Cawthorn filed this action he acknowledged that a preliminary injunction was functionally identical to a permanent injunction by asking the district court to consolidate the preliminary injunction with the final merits. *See* Pl.'s Mot. to Consolidate, ECF No. 5 (Jan. 31, 2022).

Consequently, the same principle should apply to the preliminary injunction as would apply to a final judgment. The Challengers, as denied intervenors, should be permitted to file a notice of appeal as to the preliminary injunction, to become effective if the denial of intervention is reversed. And, because the preliminary injunction would permanently harm the Challengers' interests, they should be permitted to file this emergency motion to stay the injunction pending appeal. A contrary rule would prevent a prospective intervenor who successfully appeals the district court's denial of his intervention motion from securing the ultimate object of

such motion – here, reversal of the preliminary injunction that, unless reversed, will permanently and finally block their state candidacy Challenge.

This result is particularly appropriate here, where the district court *relied on* action by at least one Challenger to justify the existence of an Article III case or controversy in the first instance. The district court, after excluding the Challengers from the proceedings by denying the intervention motion, explicitly determined that Cawthorn had standing, and that his challenge was ripe, *solely* because of proposed-intervenor Ashton's new filing before the State Board of Elections. (Trans. 5, ll. 13-20, 6 ll. 10-1; *see also* Millen Aff., Ex. C). Since the district court grounded its own jurisdiction (standing and ripeness) on proposed-intervenor Ashton's filing before a neutral adjudicative body, but then refused to let her participate in the proceedings, it would be manifestly unfair for this Court to prevent her from appealing the preliminary injunction that squelched her state administrative Challenge.

## II.    The Need For A Stay Is Exigent Given The Timing Of The North Carolina Primary.

In furtherance of its interest in protecting the integrity of its political processes, North Carolina provides an expedited and efficient procedure which enables voters to challenge candidates who are believed to be constitutionally or statutorily unqualified for election to office. North Carolina's procedure is found in Article 11B of Chapter 163 of the North Carolina General Statutes.

Pursuant to Article 11B, a registered voter may file a challenge, under oath, within 10 days after the close of candidate filing. Thereafter, the proper panel must conduct a hearing and return findings of fact, conclusions of law, and an order within 20 business days after the challenge is filed. *See* N.C. Gen. Stat. §§ 163-127.4(a)(4) and (d). Here, the Challenges to Representative Cawthorn was timely filed before the close of candidate filing.

However, well before voting can begin, the boards of election must prepare their ballots. Ideally, the determination of a candidate's qualifications should precede the preparation of the ballots. As a consequence of redistricting litigation, North Carolina's March 8, 2022 primary was postponed until May 17, 2022.[4] Pursuant to N.C. Gen. Stat. § 163-227.10(a), the state must begin mailing absentee ballots 50 days prior to primary Election Day (unless the State Board authorizes a reduction to 45 days). A 45-day period is also specified in the federal Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA), 52 U.S.C. § 20302(a)(8)(A). Thus, absentee ballots must be prepared and ready to be mailed by March 28, 2022.

It is therefore imperative that the expedited process provided in Article 11B be commenced at the first possible opportunity to enable the Challengers to exercise

---

[4] The final impediment to the implementation of North Carolina's new congressional maps and the May 17, 2022 primary was removed on March 7, 2022 by the U.S. Supreme Court's denial of the application for stay by the North Carolina legislative defendants in *Moore v. Harper*, No. 21A455 (U.S. Mar. 7, 2022).

their statutory rights to seek a determination as to the qualifications of the challenged candidate well before the May 17, 2022 primary.

## III.    The Challengers Are Entitled To A Stay.

The Challengers request that this Court stay the district court's injunction pending appeal.  The relevant factors are: (1) whether the party seeking a stay "has made a strong showing" toward success "on the merits"; (2) whether the party "will be irreparably injured absent a stay"; (3) whether a stay "will substantially injure the other parties"; and (4) "where the public interest lies."  *Nken v. Holder*, 556 U.S. 418, 425-26 (2009).  Those factors favor a stay here.

### A.    The Challengers Have A Strong Merits Argument.

The Challengers more than meet the requirement of making a "strong showing" on the merits, demonstrating at a minimum that their arguments are "substantial."  *Hilton v. Braunskill*, 481 U.S. 770, 776, 778 (1987).

#### 1.    The District Court's Ruling Is Manifestly Wrong.

##### a.    The Amnesty Act of 1872 Did Not Forever Absolve All Future Insurrectionists.

Section 3 of the Fourteenth Amendment (the "Disqualification Clause"), adopted in 1868, provides in full:

> No person shall be a Senator or Representative in Congress, or elector of President and Vice President, or hold any office, civil or military, under the United States, or under any state, who, having previously taken an oath, as a member of Congress, or as an officer of the United States, or as a member of any state legislature, or as an executive or judicial officer of any state, to support the Constitution of the United States, shall have engaged in insurrection or rebellion against the same,

8

or given aid or comfort to the enemies thereof.  But Congress may by a vote of two-thirds of each House, remove such disability.

In 1872, Congress, by a two-thirds vote, adopted an Amnesty Act which, with certain exceptions not pertinent here, provided "[t]hat all political disabilities imposed by the third section of the fourteenth article of amendments of the Constitution of the United States are hereby removed from all persons whomsoever." Act of May 22, 1872, ch. 193, 17 Stat. 142 (1872) (the "1872 Act").

The district court stated the crucial question as follows:  "Does the 1872 Act state that all political disabilities imposed by the third section of the 14th Article of the Amendments to the Constitution of the United States are hereby removed?" (Trans. 56.)  Its answer in the affirmative is wrong.

Cawthorn argued – and the district court agreed – that the 1872 Act granted amnesty to all future insurrectionists from 1872 until the end of time.  The district court's explanation of its ruling was short and simple to a fault:  "Is Madison Cawthorn a person?  Yes, he is.  Is he a person whomsoever?  Yes, he is." (Trans. 56.)  "Is the disability that they seek to impose against him a disability imposed by Amendment 14 Section 3?  Yes, it is." (*Id*.)  "Does the 1872 Act state that all political disabilities imposed by the third section of the 14th Article of the Amendments of the Constitution of the United States are hereby removed from all persons whomsoever?  With some exceptions?  Yes, it does." (*Id*.)

This novel and bizarre statutory interpretation contradicts the statutory text, basic logic, legislative history, and Congress's own understanding, and would, in any event, likely render the 1872 Act unconstitutional.

> ### i.    The 1872 Act's plain meaning is to "remove[]" disabilities that had already been "imposed."

The district court's interpretation of the interplay between the 14th Amendment and the 1872 Act ignores the basic language of the two, most particularly the tenses used by each.  The 14th Amendment's use of the future perfect tense – "shall have engaged in insurrection" – clearly indicates that it is applicable not only to those persons who had engaged in the recent insurrection against the United States in the Civil War, but also to persons who would do so in the future.  The 1872 Act, however, used only the past tense to describe its effect: "all political disabilities *imposed* by the third section of the fourteenth article of amendments of the Constitution of the United States are hereby *removed* from all persons whomsoever" (emphasis added).  It was enacted pursuant to the constitutional grant of authority to Congress to "remove" the disability.

Despite the district court's contention that it was engaging in a "plain language interpretation at the outset" by "first and foremost striv[ing] to implement Congressional intent" (Trans. 57), the district court finds an intent where none can be found.  If the 1872 Act had intended to render the Disqualification Clause forever nugatory, then, at a minimum, Congress would have plainly said so.  Congress does

10

not "hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) (Scalia, J.). Rather, in both title ("An Act to remove political Disabilities imposed by the fourteenth article of the Amendments to the Constitution of the United States") and body, the 1872 Act uses "imposed" in past tense. That necessarily means disabilities *already* imposed – not disabilities the amendment might impose in the future. By analogy, we do not say the First Amendment "protected" freedom of speech; we say it "protects" that freedom. Likewise, the Disqualification Clause *imposes* disqualification on all people who engage in insurrection. In addition, the 1872 Act uses the word "remove," which means to take *away* something already present. The 1872 Act could not "remove" disabilities from people not yet alive with no disabilities to remove. Any plain reading of the 1872 Act necessarily must recognize that it could apply only to lives in being, not future generations of insurrectionists.

> ii.     **Legislative history confirms congressional intent to apply the Disqualification Clause prospectively but amnesty only retrospectively.**

In drafting the Disqualification Clause, Congress twice rejected alternative language that would apply *only* to the Civil War. *See* Cong. Globe, 39th Cong., 1st Sess. 2900 (1866)[5] (proposed amendment limiting disqualification to those who "within ten years preceding the 1st of January, 1861" swore oath to support

---

[5] Found at: http://bit.ly/1S2900.

Constitution; rejected 32-10); Cong. Globe, 39th Cong., 1st Sess. 2545 (1866)[6]

(earlier House version referring to "the late insurrection"). Both times, Congress

instead chose to disqualify *future* insurrectionists as well.

By contrast, the 1872 Act's legislative history – passed just six years after the

Fourteenth Amendment's enactment, with several amendment framers still in office

– exclusively addressed amnesty for *ex-Confederates*. *See* Gerard N. Magliocca,

*Amnesty and Section Three of the Fourteenth Amendment*, 36 Const. Comm. 87,

111-20 (2021). Neither Cawthorn nor the district court has identified *any* indication

in the legislative record that Congress in 1872 had an intention or inkling of

absolving *future* insurrectionists.

### iii. Congress has consistently interpreted the Act as retrospective only because it lacks the power to enact a prospective amnesty.

When interpreting issues at the nexus of congressional action and

constitutional text, federal courts "put significant weight upon historical practice."

*NLRB v. Noel Canning*, 573 U.S. 513, 524 (2014). Courts "treat[] practice as an

important interpretive factor even when the nature or longevity of that practice is

subject to dispute, and even when that practice began after the founding era." *Id.* at

525. Here, Congress has consistently interpreted its 19th-century amnesties as

retrospective only – not merely as a matter of interpreting its own past actions, but

---

[6] Found at: http://bit.ly/1H2545.

because it has correctly understood that its own power under the Disqualification Clause is limited and cannot absolve future insurrectionists.

In 1919, the House considered a claim similar to Cawthorn's from Representative-elect Victor Berger. *See* 6 Clarence Cannon, *Cannon's Precedents of the House of Representatives of the United States*, ch. 157, §§ 56-59, at 52–63 (1936).[7]  Under the district court's logic, the 1872 Act absolved Berger as a non-Confederate.  No one raised that argument, but the House rejected a nearly identical claim based on the Amnesty Act of June 6, 1898, ch. 389, 30 Stat. 432:

> Congress has no power whatever to repeal a provision of the Constitution by a mere statute, and … no portion of the Constitution can be repealed except in the manner prescribed by the Constitution itself. While under the provisions of section 3 of the fourteenth amendment Congress was given the power, by a two-thirds vote of each House, to remove disabilities incurred under this section, *manifestly it could only remove disabilities incurred previously to the passage of the act, and Congress in the very nature of things would not have the power to remove any future disabilities*.

*Id.* at 55 (emphasis added).  It is rare enough for Congress to acknowledge limits on its own constitutional power in *any* context; since the House of that era held an expansive view of its own powers to exclude Members,[8] the fact that it acknowledged a limitation on its own Section Three power – a imitation that would prevent prospective amnesties – is especially noteworthy.  *See also* Cong. Res. Serv.,

---

[7] Found at:  http://bit.ly/6Canon56.

[8] *See* H.R. Rep. No. 66-413, at 9-11 (1919) (stating expansive view of power to exclude but recognizing that Section Three amnesty power does not authorize prospective amnesties).

"The Insurrection Bar to Office: Section 3 of the Fourteenth Amendment" (Jan. 29, 2021), at 2 ("The [1872] Act appears to be retrospective and apparently would not apply to later insurrections or treasonous acts")[9]; Cong. Res. Serv. Rept. R41946, "Qualifications of Members of Congress" (Jan. 15, 2015), at 18 (similar).[10]

### iv.   The 1872 Act must be construed to avoid unconstitutionality.

Under the canons of constitutional avoidance, "every reasonable construction must be resorted to, in order to save a statute from unconstitutionality." *Gonzales v. Carhart*, 550 U.S. 124, 153 (2007) (cleaned up).   Indeed, "a statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score."  *Rust v. Sullivan*, 500 U.S. 173, 191 (1991) (cleaned up). The district court's reading, however, presents substantial constitutional problems for the 1872 Act.

**1.    Article V workaround.**  The district court does not technically endorse an interpretation that the 1872 Act *directly* repealed the Disqualification Clause, instead finding that Congress simply used its amnesty power to the broadest possible extent by absolving all insurrectionists, past and future.  (*See* Trans. 56.)  But that empty formalism elides the real consequences of the ruling, which interprets the 1872 Act to nullify the Disqualification Clause.  Under that logic, Congress could extend a president's term indefinitely via calendar reform legislation that eliminates

---

[9] Found at:  http://bit.ly/CRSs3.
[10] Found at:  http://bit.ly/CRS41946.

the month of January. *Cf.* U.S. Const. amend. XX, § 1. If the Disqualification Clause was intended to amend the Article V process, it would have said so. Without such explicit language, the power conferred by that clause cannot be read to give Congress the power to repeal it without the consent of the States. The district court's interpretation would render the 1872 Act unconstitutional. It must therefore be reversed.

2. **Prospective amnesties.** A president cannot pardon crimes not yet committed. *See Ex parte Garland*, 71 U.S. (4 Wall.) 333, 380 (1866). The power to pardon future crimes would be "a power to dispense with the observance of the law." William F. Duker, *The President's Power to Pardon: A Constitutional History*, 18 Wm. & Mary L. Rev. 475, 525-26 (1977). The same logic applies to prospective congressional amnesties. This is especially so given that the text of the Disqualification Clause only gives Congress the power to "remove such disabilit[ies]" incurred under that clause – that is, disabilities incurred *prior* to the act of removal. Even if Congress had written that "all future insurrectionists hereby have their disabilities removed," such an act would be null because it is not part of the power conferred by the Constitution. As noted *supra*, for well over a century Congress has agreed, understanding that its own Section Three power is limited because "Congress in the very nature of things would not have the power to remove any future disabilities." 6 *Cannon's Precedents of the House of Representatives of the United States*, ch. 157, at 55.

**B.  The Remaining Factors Favor A Stay Pending Appeal.**

The remaining considerations favor a stay pending appeal as well.  As discussed above, the Challengers "will be irreparably injured absent a stay."  *Nken*, 556 U.S. at 425-26.  That is because the preliminary injunction, by enjoining the Board of Elections from convening a panel to hear their Challenge, will deny the Challengers their rights as North Carolina voters under the challenge statute to have their congressional candidate's constitutional qualifications determined.

It is also apparent that a stay will not "substantially injure the other part[y]," Cawthorn.  *Nken*, 556 U.S. at 426.  That is because the only "injury" identified by the district court with respect to Cawthorn was "being compelled to prepare a defense to the challenge" (Trans. 53), and "having to proceed with the state proceeding" (*id*. at 54), which might or might not find him qualified.  As the district court had to recognize:  "We don't have a panel yet.  There's no ongoing investigation, no witnesses have yet been heard."  (*Id*. at 54.)  Cawthorn's amorphous "ongoing First Amendment injury" was recognized by the district court, while the potential Fourteenth Amendment injury to the Challengers, as well as the citizens of North Carolina and the nation as a whole of being represented by an insurrectionist was entirely ignored.

Finally, it is clear "where the public interest lies."  *Nken*, 556 U.S. at 426.  The public's interest in being represented or governed by persons who have not engaged in insurrection or rebellion against the United States of America is paramount.  This

16

is not a question committed to the district court's discretion; Congress and the states found this public interest sufficiently important to enact it as a provision of the U.S. Constitution.  Indeed, Congress only readmitted North Carolina to the Union after the Civil War by an Act explicitly requiring the State to exclude insurrectionists from office.  *See* An Act to Admit the States of North Carolina [et al.], to Representation in Congress, 15 Stat. 73 (June 25, 1868).  This public interest extends far beyond western North Carolina; the insurrection of January 6, 2021 took place hundreds of miles from Cawthorn's district, and threatened constitutional democracy for the entire country.

The district court, however, took a different tack by locating the public interest in the minority of people who "proceed to the ammunition box" when dissatisfied with the protections offered by "the soap box, the ballot box, and jury box," and finding in their interests "an obligation to rule."  (Trans. 62.)  By that logic, the insurrectionists of January 6, 2021 were entitled to the installation of their preferred candidate rather than the duly elected 2020 candidate for president.

In sum, a preliminary injunction based upon a determination of congressional amnesty for future insurrectionists turns the law on its head and should not be allowed to stand.

## CONCLUSION

The Challengers' motion for a stay pending appeal should be granted.

This the 9th day of March, 2022.

Respectfully submitted,

*/s/ Pressly M. Millen*
Pressly M. Millen
Raymond M. Bennett
Scott D. Anderson
Hayes Jernigan Finley
Womble Bond Dickinson (US) LLP
555 Fayetteville Street, Suite 1100
Raleigh, NC 27601
Office: 919.755.2135
Fax: 919.755.6067
Email: Press.Millen@wbd-us.com
         Ray.Bennett@wbd-us.com
         Scott.D.Anderson@wbd-us.com
         Hayes.Finley@wbd-us.com

John R. Wallace
Lauren T. Noyes
Post Office Box 12065
Raleigh, NC 27605
Office: 919.782.9322
Fax: 919.782.8133
Email: jrwallace@wallacenordan.com
         ltnoyes@wallacenordan.com

Robert F. Orr
3434 Edwards Mill Road, Suite 112-372
Raleigh, NC 27612
Office: 919.608.5335
Email: orr@rforrlaw.com

Ronald Fein
John C. Bonifaz
Ben Clements

Courtney Hostetler
Benjamin Horton
Free Speech For People
1320 Centre St. #405
Newton, MA 02459
Office: 617.244.0234
Email: rfein@freespeechforpeople.org

*Attorneys for Defendant-Intervenor-Appellants Barbara Lynn Amalfi, Laurel Ashton, Natalie Barnes, Claude Boisson, Mary Degree, Carol Ann Hoard, June Hobbs, Marie Jackson, Michael Jackson, Anne Robinson, David Robinson, Carol Rose, and James J. Walsh*

*Of Counsel*

James G. Exum, Jr. (State Bar #1392)
6 Gleneagle Ct.
Greensboro, NC 27408
Office: 336.554.1140
Email: jimxzoom@gmail.com

## LOCAL RULE 27(a) STATEMENT

Pursuant to Local Rule 27(a), counsel for all parties have been informed of the intended filing of this motion.  Plaintiff does not consent and has indicated his intent to file a response to the motion.  Defendants have not yet determined their position on the relief sought by this motion.

## CERTIFICATE OF COMPLIANCE

1.      This motion complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because this motion contains fewer than 5,200 words, excluding the parts of the motion exempted by Fed. R. App. P. 27(d)(2) and Fed. R. App. P. 27(a)(2)(B).

2. This motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this motion has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14 point font.

March 9, 2022

/s/ Pressly M. Millen
Pressly M. Millen

21

## <u>CERTIFICATE OF SERVICE</u>

I certify that today, March 9, 2022, I caused to be electronically filed the foregoing motion with the Clerk of the Court for the U.S. Court of Appeals for the Fourth Circuit using the appellate CM/ECF system. In addition, the following were served and provided notice by first-class mail and email:

James Bopp , Jr.
Melena S. Siebert
The Bopp Law Firm, PC
1 South Sixth Street
Terre Haute, IN 47807
Email: JBoppJr@aol.com
Email: msiebert@bopplaw.com

Joshua Brian Howard
Gammon, Howard & Zeszotarski, PLLC
115 1/2 West Morgan St.
Raleigh, NC 27601
Email: jhoward@ghz-law.com

Amar Majmundar
Mary Carla Babb
Stephanie Ann Brennan
Terence Steed
North Carolina Department of Justice
114 West Edenton Street, 9001 Mail Service Center
Post Office Box 629
Raleigh, NC 27602-0629
Email: amajmundar@ncdoj.gov
Email: mcbabb@ncdoj.gov
Email: sbrennan@ncdoj.gov
Email: tsteed@ncdoj.gov

*/s/ Pressly M. Millen*
Pressly M. Millen