No. 22-1251

# In the
# United States Court of Appeals
## For the Fourth Circuit

────────────────

MADISON CAWTHORN,

*Plaintiff-Appellee,*

v.

BARBARA LYNN AMALFI, *et al.*,

*Defendants-Intervenors-Appellants.*

────────────────

On Appeal from the United States District Court
for the Eastern District of North Carolina
Newark Division
Case No. 5:22-cv-00050-M

────────────────

**BRIEF OF PROFESSOR DEREK T. MULLER
AS *AMICUS CURIAE* IN SUPPORT OF NO PARTY**

────────────────

Michael Francisco
Michael A. Brody
MCGUIREWOODS LLP
888 16th Street N.W., Suite 500
Washington, D.C. 20006
T: (202) 857-1722

*Counsel for Amicus Curiae*

────────────────

April 21, 2022

# TABLE OF CONTENTS

**Page**

INTEREST OF *AMICUS CURIAE*............................................................ 1

SUMMARY OF ARGUMENT ................................................................. 1

ARGUMENT ......................................................................................... 3

I.  States may not add qualifications to candidates seeking
    congressional office, and Appellants' efforts constitute an additional
    qualification......................................................................................... 3

    A. If elected, Cawthorn may meet all constitutional qualifications
       when he presents his credentials to Congress even if he does
       not meet them today........................................................................ 3

    B. Candidates who appear ineligible before Election Day may still
       run for office if they may meet qualifications later. ....................... 5

II. States do not have the power to adjudicate the constitutional
    qualifications of prospective members of Congress............................ 7

    A. No clause in the Constitution authorizes the State to evaluate
       qualifications of candidates. ......................................................... 10

    B. States have historically lacked the ability to examine
       qualifications of candidates and exclude them from the ballot..... 13

    C. A determination of qualifications would usurp the power of
       Congress to determine of qualifications. ...................................... 17

III. Federal courts do not have the power to determine the
     constitutional qualifications of prospective members of Congress.... 19

    A. Federal courts have no authority to review the qualifications of
       congressional candidates. ............................................................. 19

    B. The Constitution grants greater leeway to review the
       qualifications of presidential candidates. ..................................... 21

CONCLUSION ................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Celebrezze,*
   460 U.S. 780 (1983) ............................................................... 11

*Application of James,*
   241 F. Supp. 858 (S.D.N.Y. 1965) ......................................... 19

*Baker v. Carr,*
   369 U.S. 186 (1962) ................................................................ 19

*Burdick v. Takushi,*
   504 U.S. 428 (1992) .................................................................. 7

*Burton v. United States,*
   202 U.S. 344 (1906) .................................................................. 8

*Campbell v. Davidson,*
   233 F.3d 1229 (10th Cir. 2000) .............................................. 16

*Chiafalo v. Washington,*
   140 S.Ct. 2316 (2020) ............................................................ 23

*Cox v. McCrery,*
   2007 WL 97142 (W.D. La. Jan. 5, 2007) ............................... 15

*Hassan v. Colorado,*
   495 F. App'x 947 (10th Cir. 2012) ......................................... 22

*Hassan v. Colorado,*
   870 F. Supp. 2d 1192 (D. Colo. 2012) .................................... 22

*Hassan v. Iowa,*
   2012 WL 12974068 (S.D. Iowa Apr. 26, 2012) ................. 21, 22

*Hassan v. Iowa,*
   493 F. App'x 813 (8th Cir. 2012) ........................................... 26

*Hassan v. New Hampshire,*
   2012 WL 405620 (D.N.H. Feb. 8, 2012) ................................ 22

*Hassan v. United States,*
   2010 WL 9493338 (E.D.N.Y. June 15, 2010) ........................ 21

*Hassan v. United States,*
  441 F. App'x 10 (2d Cir. 2011) ............................................................ 21

*Jones v. Bush,*
  122 F.Supp.2d 713 (N.D. Tex. 2000) ................................................... 23

*Jones v. Montague,*
  194 U.S. 147 (1904) .............................................................................. 7

*Keogh v. Horner,*
  8 F. Supp. 933 (S.D. Ill. 1934) ........................................................... 20

*Lindsay v. Bowen,*
  750 F.3d 1061 (9th Cir. 2014) ............................................................ 22

*Lubin v. Panish,*
  415 U.S. 709 (1974) ............................................................................ 12

*Morgan v. United States,*
  801 F.2d 445 (D.C. Cir. 1986) .............................................................. 8

*Nat'l Comm. of the U.S. Taxpayers Party v. Garza,*
  924 F. Supp. 71 (W.D. Tex. 1996) ...................................................... 23

*Peace and Freedom Party v. Bowen,*
  912 F. Supp. 2d 905 (E.D. Cal. 2012) ................................................. 22

*Powell v. McCormack,*
  395 U.S. 486 (1969) ......................................................................... 3, 8

*Roudebush v. Hartke,*
  405 U.S. 15 (1972) ......................................................................... 15, 16

*Sevilla v. Elizalde,*
  112 F.2d 29 (D.C. Cir. 1940) .............................................................. 19

*Socialist Workers Party of Illinois v. Ogilvie,*
  357 F. Supp. 109 (N.D. Ill. 1972) ....................................................... 21

*State ex rel. Chavez v. Evans,*
  446 P.2d 445 (N.M. 1968) ................................................................... 15

*Storer v. Brown,*
  415 U.S. 724 (1974) .............................................................................. 7

*U.S. Term Limits, Inc. v. Thornton,*
  514 U.S. 779 (1995) ................................................................. 3, 10, 11

iii

**Constitution and Statutes**

U.S. CONST. art. I, § 2, cl. 2........................................................5, 6

U.S. CONST. art. I, § 3, cl. 3 ......................................................5, 6

U.S. CONST. art. I, § 4, cl. 1 ........................................................11

U.S. CONST. art. I, § 5, cl. 1 ....................................................15, 22

U.S. CONST. art. II, § 1, cl. 2 ......................................................23

U.S. CONST. amend. XII...............................................................22

U.S. CONST. amend. XIV, § 3 ........................................................3, 4

2 U.S.C. § 382 .............................................................................17

N.C. GEN. STAT. § 163-122(a) .........................................................7

WILLIAM T. DORTCH, CODE OF NORTH CAROLINA (1883) ..........................14

**Treatises**

ALEXANDER KEYSSAR, THE RIGHT TO VOTE: THE CONTESTED HISTORY OF
DEMOCRACY IN THE UNITED STATES (2000)............................................13

CANNON'S PRECEDENTS OF THE U.S. HOUSE OF
REPRESENTATIVES (1936) ...............................................................6

DESCHLER'S PRECEDENTS (1977).................................................5, 6, 17

HINDS' PRECEDENTS (1907) ...............................................................6

JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED
STATES (1833)................................................................................10

LIONEL E. FREDMAN, THE AUSTRALIAN BALLOT: THE STORY OF AN
AMERICAN REFORM (1968)................................................................13

WILLIAM HOLMES BROWN, CHARLES W. JOHNSON, & JOHN V. SULLIVAN,
HOUSE PRACTICE (2011)............................................................17, 18

**Other Authorities**

153 CONG. REC. (2007)..................................................................17

167 CONG. REC. (2021)..................................................................22

Brian C. Kalt, *Swearing in the Phoenix: Toward a More Sensible System for Seating Members of the House of Representatives at Organization*, 105 MARQ. L. REV. 1 (2021) ..................................................................10

Derek T. Muller, *Ballot Speech*, 58 ARIZ. L. REV. 693 (2016) ..............................................................1, 14

Derek T. Muller, *Scrutinizing Federal Electoral Qualifications*, 90 IND. L.J. 559 (2015) .......................................................................1, 7

Derek T. Muller, *Weaponizing the Ballot*, 48 FLA. ST. U. L. REV. 61 (2021) ...............................................1, 11

Donald Janson, *Delaware Elects Youngest U.S. Senator*, N.Y. TIMES, Nov. 9, 1972 ............................................................................5

Jeremy Alford, *Louisiana Judge Rejects Suit Over Landrieu's Residency*, N.Y. TIMES, Sept. 5, 2014 .......................................................................6

## INTEREST OF *AMICUS CURIAE*[1]

Derek T. Muller is the Bouma Fellow in Law and Professor of Law at University of Iowa College of Law. He teaches and writes about election law and federal courts, and he has an interest in the resolution of this case within the appropriate legal framework. Portions of this argument are drawn from his previous scholarship, including *Weaponizing the Ballot*, 48 FLA. ST. U. L. REV. 61 (2021); *Ballot Speech*, 58 ARIZ. L. REV. 693 (2016); and *Scrutinizing Federal Electoral Qualifications*, 90 IND. L.J. 559 (2015).

## SUMMARY OF ARGUMENT

Appellants ask this Court for something unprecedented. They ask this Court to be the first federal appeals court in history to approve the State's power to disqualify a congressional candidate. But States lack the power to exclude a congressional candidate from the ballot over a qualification that a candidate might ultimately meet when he presents his credentials

---

[1] The University of Iowa College of Law is not a signatory to the brief, and the views expressed here are those of *amicus curiae*. The University provides financial support for faculty members' research and scholarship activities, support that helped defray the costs of preparing this brief. The parties consented to this filing.

to Congress. The district court's decision should be affirmed, albeit on a ground different from the one it gave.

The district court erred in adjudicating that Madison Cawthorn was constitutionally qualified to hold congressional office. Federal courts lack the power to determine whether a congressional candidate is eligible for office.

But the district court was right to reach the conclusion it did. The State, like the district court, lacks the power to adjudicate the qualifications of congressional candidates. That is particularly true in this case: even if Appellants are correct and Cawthorn is presently ineligible, he may qualify before presenting his credentials to Congress.

There are many nuanced and complicated directions for this case to go. In the end, *amicus* offers the narrowest appropriate grounds for affirmance: a State may not add qualifications to a candidate seeking office, which is what Appellants propose to investigate.

# ARGUMENT

## I. States may not add qualifications to candidates seeking congressional office, and Appellants' efforts constitute an additional qualification.

This case can most readily be resolved by asking one question. "If elected, is it possible that this congressional candidate will meet all the constitutional qualifications for office when he presents his credentials to Congress?" The answer is yes. And because it is yes, the State has no power to disqualify a candidate on those qualifications now.

States cannot add qualifications to congressional candidates seeking office. *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 806 (1995). *Accord Powell v. McCormack*, 395 U.S. 486, 548 (1969). Even if Cawthorn is presently disqualified, he may qualify to serve later. Appellants' attempt to evaluate Cawthorn's qualifications today—months before he submits his credentials to Congress—is an additional qualification.

### A. If elected, Cawthorn may meet all constitutional qualifications when he presents his credentials to Congress even if he does not meet them today.

At this moment, it is impossible for the State to determine whether Cawthorn will be disqualified for "engag[ing] in insurrection or rebellion." U.S. CONST. amend. XIV, § 3. The Fourteenth Amendment

provides, "No person shall be a Senator or Representative in Congress" who has engaged in insurrection or rebellion. But it also provides, "Congress may by a vote of two-thirds of each House, remove such disability."

If Cawthorn engaged in insurrection or rebellion, Congress has the power to remove that disability. It may do so before Election Day. It may do so after Election Day. And if Cawthorn is elected, it may even do so when Cawthorn presents his credentials to Congress.

In other words, even if Appellants' factual allegations and legal conclusions are entirely true, they are immaterial. Cawthorn is still capable of meeting the qualifications by the time he presents his credentials to Congress—that is, at the time he "*shall be* a . . . Representative in Congress." U.S. CONST. amend. XIV, § 3 (emphasis added).

Even assuming the State has the power to evaluating qualifications of candidates—a contested proposition, see *infra*, Part II—it cannot add qualifications. Demanding that Cawthorn meet a qualification today is an additional qualification.

### B. Candidates who appear ineligible before Election Day may still run for office if they may meet qualifications later.

Candidates who are ineligible before Election Day routinely run for office and win elections. House precedent recognizes that "age and citizenship qualifications of the Constitution need not be met until the time membership actually commences." 2 DESCHLER'S PRECEDENTS ch. 7, § 10.1 (1977).

Consider age qualifications. A member of the House of Representatives must be at least 25 years of age, and a Senator must be at least 30 years of age. U.S. CONST. art. I, § 2, cl. 2; & § 3, cl. 3.

Prospective members of Congress who are underage on Election Day are still eligible as long as they are of age when they present their credentials when the House convenes. Consider Joe Biden. He first won election to the Senate on November 7, 1972, when he was just 29 years of age. But he turned 30 before he presented his credentials to Congress. Donald Janson, *Delaware Elects Youngest U.S. Senator*, N.Y. TIMES, Nov. 9, 1972.

Indeed, prospective members of Congress who are ineligible when a new session of Congress begins may *delay* presenting their credentials

until they are of age. John Young Brown, for instance, earned a certificate of election in 1859 from Kentucky, but he was not sworn in until December 3, 1860, when he was twenty-five years of age. 2 DESCHLER'S PRECEDENTS ch. 7, § 10.2.

Or consider the qualification of where a candidate lives. Members of Congress must be an "inhabitant" of their state "when elected." U.S. Const. art. I, § 2, cl 2; & § 3, cl. 3. Inhabitancy can only be ascertained on Election Day, not before. Courts have tossed attempts to adjudicate residency qualifications prematurely. *See, e.g.*, Jeremy Alford, *Louisiana Judge Rejects Suit Over Landrieu's Residency*, N.Y. TIMES, Sept. 5, 2014.

Then there's citizenship. Candidates have delayed presenting their credentials to Congress until they meet the citizenship requirements. *See, e.g.*, 2 DESCHLER'S PRECEDENTS ch. 7, § 10.1 (noting that Henry Ellenbogen of Pennsylvania delayed presenting his credentials until the second session of Congress in order to attain the seven-year citizenship requirement).

Congress has developed a robust body of precedent about how to construe these qualifications. *See generally* DESCHLER'S PRECEDENTS; HINDS' PRECEDENTS (1907); CANNON'S PRECEDENTS OF THE U.S. HOUSE OF

REPRESENTATIVES (1936). Precedent allows candidates to withhold presentment of their credentials to Congress until a candidate meets the requisite qualifications. *See* Muller, *Scrutinizing*, 90 IND. L.J. at 584.

This narrow ground avoids Appellants' parade of horribles. *See* Br. of Appellants, Doc. 79, at 54 ("[I]f a teenager in another country (or hundreds of them) submitted paperwork for Congress, states would be required to include them on the ballot.").[2]

## II. States do not have the power to adjudicate the constitutional qualifications of prospective members of Congress.

While this case can be decided on the narrow ground identified in Part I, it is worth framing the bigger issue. State do not have any power to adjudicate the qualifications of prospective members of Congress.

The House of Representatives "is the sole judge of the qualifications of its members." *Jones v. Montague*, 194 U.S. 147, 153 (1904). *Accord*

---

[2] North Carolina has adequate "manner" restrictions in place to prevent such imaginative scenarios. *See Burdick v. Takushi*, 504 U.S. 428, 439–40 (1992). One wonders, for instance, how "hundreds" of foreign teenagers would organize campaigns to secure nominating petitions signed by 1.5% of the qualified voters in a district. *See, e.g.*, N.C. GEN. STAT. § 163-122(a). Ample alternatives exist for the State to ensure that the ballot remains a place for "major struggles." *Storer v. Brown*, 415 U.S. 724, 735 (1974).

*Burton v. United States*, 202 U.S. 344, 366 (1906) (examining the Constitution and concluding that "the Senate is made by that instrument the sole judge of the qualifications of its members"); *Powell*, 395 U.S. at 552 (1969) (separate opinion of Douglas, J.) ("Contests may arise over whether an elected official meets the 'qualifications' of the Constitution, in which event the House is the sole judge.").

The words of then-Judge Antonin Scalia explained the logic succinctly: "The provision states not merely that each House 'may judge' these matters, but that each House 'shall be *the* Judge' (emphasis added). The exclusion of others—and in particular of others who are judges—could not be more evident." *Morgan v. United States*, 801 F.2d 445, 447 (D.C. Cir. 1986).

Appellants openly recognize *in this very appeal* that Congress's judgments should control, citing the election and subsequent disqualification of Victor Berger. *See* Br. of Appellants, Doc. 79, at 39–42 (describing precedent of Congress's post-election adjudication of the qualifications of Victor Berger). *Accord* Br. of Constitutional Accountability Ctr.. Doc. 76, at 14–16 (same).

8

Appellants ask a federal court to reach the same conclusion as Congress might reach in a similarly-situated case and to rely on Congress's precedent in similarly-situated qualifications challenges. It is the paradigmatic example of why the State has no authority to prematurely reach an adjudication on Cawthorn's qualifications. That is because Congress makes qualifications determinations that are not always intuitive to States or to courts. *See supra* Part I.B.

The Berger case is a perfect example of the historical absence of State power to adjudicate qualifications. Berger was elected in 1918, and Congress in 1919 concluded that Berger was not qualified to serve. 6 CANON'S PRECEDENTS § 57–58. "Subsequently the Governor of Wisconsin called a special election to fill the vacancy thus created. At this election Victor L. Berger was again a candidate and received 24,350 votes, and Henry H. Bodenstab, the contestant, received 19,566." *Id.* at § 59. That is, even *after* Congress *expressly* held that a candidate was not qualified to serve, Wisconsin made no effort to exclude him, and the people again had free choice, electing him again.

There is no difference whether the State attempts to evaluate the qualifications of a candidate before or after the election. There is no

9

constitutional basis for such a distinction. *See, e.g.*, *U.S. Term Limits*, 514 U.S. at 828–36 (1995) (rejection notion that pre-election qualifications are permissible to regulate). Both pre- and post-election candidates are prospective members of Congress. At best, a post-election candidate who receives a certificate of election is presumptively entitled to be seated in Congress. Even then, Congress has judged the "elections, returns and qualifications" of people who are not seated—that is, who have not yet become "members." *See* Brian C. Kalt, *Swearing in the Phoenix: Toward a More Sensible System for Seating Members of the House of Representatives at Organization*, 105 MARQ. L. REV. 1 (2021).

## A. No clause in the Constitution authorizes the State to evaluate qualifications of candidates.

Justice Joseph Story opined in his *Commentaries* that "states can exercise no powers whatsoever, which exclusively spring out of the existence of the national government, which the Constitution does not delegate to them." 2 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 626 (1833). States may not add qualifications to congressional candidates, for instance, because those qualifications are fixed by the Constitution. *Id.*

Therefore, any State power to regulate any facet of federal elections must spring from some provision of the Constitution. State power over the "manner" of regulating congressional elections comes from the Elections Clause. U.S. CONST. art. I, § 4, cl. 1; *see U.S. Term Limits*, 514 U.S. at 805 (1995).

The state legislature may prescribe the "manner of holding elections." These are procedural rules. When procedural rules relate to the ballot, they must be rules for "the integrity and reliability of the electoral process itself or they are rules to require a preliminary showing of substantial support." Muller, *Weaponizing*, 48 FLA. ST. U. L. REV. at 118. *See also Anderson v. Celebrezze*, 460 U.S. 780, 788–89 n. 9 (1983).

The "integrity and reliability of the electoral process" includes the power to exclude "frivolous candidates"—frivolous, as those candidates lacking popular support. *See U.S. Term Limits*, 514 U.S. at 835 (explaining that legitimate "manner" rules excluding unserious candidates "did not involve measures that exclude candidates from the ballot without reference to the candidates' support in the electoral process"). It is not the State that adjudicates frivolity. It sets levels of

11

public support for candidates to appear on the ballot or to advance to the next round.

States undoubtedly have a legitimate interest in excluding "frivolous" candidates from the ballot. Such cases are easy to find. *See, e.g.*, *Lubin v. Panish*, 415 U.S. 709, 715 (1974). But that *interest* is distinct from the state's *power* to do so. It is why Justice Story's understanding of the scope of state authority in federal elections is so crucial. Because state authority in federal elections is *created* by the federal Constitution, any exercise of state authority must be traced *back* to some source in the federal Constitution. Appellants fail to identify the source of State authority to scrutinize qualifications.

States may regulate the "manner" of "holding elections" for congressional candidates. The "manner of holding elections" does not include the power to adjudicate qualifications. Consider Congress's powers under Article I, Section 5: "Each House shall be the judge of the elections, returns and qualifications of its own members." "Elections" and "qualifications" are separate categories. While the state legislature's power extends to determine the "manner" of "holding *elections*," that power does not extend "qualifications." The notion that "manner"

includes the power to adjudicate qualifications (or, in Appellants' view, adjudicate *before* an election but not *after*, a distinction not found in the Constitution) has no basis in law.

## B. States have historically lacked the ability to examine qualifications of candidates and exclude them from the ballot.

Appellants have not identified a single instance in which any court has approved a state's decision to exclude a congressional candidate from the ballot. This is unsurprising for a couple of reasons.

First, States did not begin printing the ballot until 1888, and even then the practice was not universal. LIONEL E. FREDMAN, THE AUSTRALIAN BALLOT: THE STORY OF AN AMERICAN REFORM 2, 31 (1968). The "Australian ballot" was a state-printed ballot that increased secrecy and reduced voter fraud. *See id.* at 31. Before that, privacy was nearly impossible: voters brought their own ballots to the polling place, often ballots printed by the candidates or parties. *See* ALEXANDER KEYSSAR, THE RIGHT TO VOTE: THE CONTESTED HISTORY OF DEMOCRACY IN THE UNITED STATES 115 (2000).

For the first hundred years of federal elections, it was impossible for states to evaluate the qualifications of House candidates before the

election. Voters voted by voice vote, wrote their votes on slips of paper, or deposited party tickets into ballot boxes. *See* Muller, *Ballot Speech*, 58 ARIZ. L. REV. at 697–98. At no point did the State have any control over the content of the ballot.

Consider how elections in North Carolina took place in this period. In 1883—nearly 100 years after the Constitution was ratified, and more than a decade after ratification of the Fourteenth Amendment—State law required that ballots must be on white paper "and may be printed or written, or partly written and partly printed." 2 WILLIAM T. DORTCH, CODE OF NORTH CAROLINA § 2687 (1883). A voter brought his ballots to the polling place, and he would "hand in his ballots to the judges, who shall carefully despite the ballots in the ballot boxes." *Id.* § 2685. County commissioners provided ballot boxes "for each class of voters to be voted for," but there was no requirement to provide ballots. *Id.* § 2688. One finds no regulation of the content of the ballot, except that if a ticket contains "the names of more persons than such elector has a right to vote for, or shall have a device [identifying mark] upon it," the ballot "shall be void." *Id.* § 2689. And one certainly finds no power of the State to exclude or refuse to count votes cast for any candidate.

14

Second, when courts have faced a challenge to a candidate's constitutional eligibility, whether before or after an election, they have concluded that there is no authority to judge a candidate's qualifications. *See, e.g., State ex rel. Chavez v. Evans*, 446 P.2d 445, 448 (N.M. 1968) (holding that congressional candidate excluded from the ballot on the basis of inhabitancy must appear on the ballot); *Cox v. McCrery*, 2007 WL 97142, at *1 (W.D. La. Jan. 5, 2007) (rejecting power to adjudicate a member-elect's inhabitancy).

This reasoning is consistent with the Supreme Court's logic in *Roudebush v. Hartke*, 405 U.S. 15 (1972). In a close Senate race, Indiana authorized a recount, which was challenged as treading upon the Senate's power to be "the judge of the elections, returns and qualifications of its own members." U.S. CONST. art. I, § 5, cl. 1. The Supreme Court held that State law cannot "usurp" the function of Congress, which can occur if the law "frustrates" a house of congress's "ability to make an independent final judgment." *Roudebush*, 405 U.S. at 25. The Senate could still independently evaluate the election or conduct its own recount. *Id.* at 25–26. It was "speculation" to believe that the recount would result

in the "accidental destruction of ballots" or something that would thwart Congress's ability to evaluate the election. *Id.* at 26.

Disqualifying a candidate, however, usurps Congress's power to adjudicate that candidate's eligibility. Simply put, there is no ability to review that candidate's qualifications, because that candidate's qualifications will never be presented to Congress—unlike the results of an election, including the initial count and the recount.

Thus far, Appellants muster no federal or state judicial opinion approving the exclusion of a congressional candidate from the ballot. Its only attempted reference is *Campbell v. Davidson*, 233 F.3d 1229 (10th Cir. 2000). A federal court found that the State impermissibly added a qualification when requiring congressional candidates to be registered voters (much like Appellants' attempt to add a qualification to Cawthorn's candidacy in this case). In *Campbell*, both parties agreed (that is, the Court accepted this stipulation, as it used the phrase "no question") that "educat[ing]" voters who may "conclude that a candidate" met congressional qualifications was a legitimate state interest. *Id.* at 1235–36. The court did not accept exclusion from the ballot as a remedy. Instead, it found that candidates willing to complete an affidavit

16

asserting that they were eligible would be sufficient to "represent this fact to its electors." *Id.*

### C. A determination of qualifications would usurp the power of Congress to determine of qualifications.

Cawthorn is presently a member of Congress. Congress holds the power to evaluate the qualifications, elections, and returns of its members, even after those members have been seated. *See, e.g.*, 153 CONG. REC. 5–6 (2007) (allowing Representative Vernon Buchannan to be seated as Congress while an election contest under 2 U.S.C. § 382 was pending).

Not all congressional candidates are currently members of Congress, so this case involves a subset of qualifications cases: does a State or a federal court have the power to second-guess the judgment of Congress? The answer is resoundingly no.

Today, Appellants could ask Congress to scrutinize Cawthorn's qualifications. *See* 2 DESCHLER'S PRECEDENTS ch. 9, § 17.3 ("An investigation of the qualification of a Member-elect to be sworn and of his right to a seat was instituted by the filing of a memorial by an individual challenging his citizenship qualifications."); WILLIAM HOLMES BROWN,

CHARLES W. JOHNSON, & JOHN V. SULLIVAN, HOUSE PRACTICE ch. 22, § 1, p. 482 (2011) ("An investigation of a challenged election has been initiated pursuant to . . . [a] petition filed by another person challenging the qualifications of a Member-Elect."). And Congress has the power to judge the qualifications of sitting members.

The fact that Congress has not done so—and that Appellants have apparently not asked Congress to do so—should counsel special hesitation. True, Congress has not adjudicated Cawthorn's eligibility, and its silence is of limited probative value. But if ever there was "the potentiality of embarrassment from multifarious pronouncements by various departments on one question," *Baker v. Carr*, 369 U.S. 186, 217 (1962), this case presents it. Cawthorn serves in Congress. Appellants demand the State adjudicate Cawthorn is ineligible to serve in Congress, where he presently serves. A judicial determination risks contradicting Congress's determination.

## III. Federal courts do not have the power to determine the constitutional qualifications of prospective members of Congress.

For the first time that *amicus* is aware of, a federal judge has determined whether a congressional candidate is qualified for the office he seeks.

### A. Federal courts have no authority to review the qualifications of congressional candidates.

Federal courts have routinely disclaimed any authority to review the qualifications of prospective members of Congress. *See, e.g.*, *Sevilla v. Elizalde*, 112 F.2d 29, 38 (D.C. Cir. 1940) ("We are cited to no cases, and we find none, in which the Federal courts have even been asked to determine the qualifications of a member of Congress. Apparently it has been fully recognized that that power is lodged exclusively in the legislative branch. Under parallel provisions in state constitutions giving state legislatures the power to determine the qualifications of their members, it is ruled that the legislative power is exclusive—that the courts have no jurisdiction."); *Application of James*, 241 F. Supp. 858, 860 (S.D.N.Y. 1965) ("Accordingly, the federal courts have no jurisdiction to pass on the qualifications and the legality of the election of any member

of the House of Representatives."); *Keogh v. Horner*, 8 F. Supp. 933, 935 (S.D. Ill. 1934) ("[T]he power of the respective Houses of Congress with reference to the qualifications and legality of the election of its members is supreme.").

Congress must remain independent of any other body in adjudicating its membership. Justice Story explained, "If lodged in any other, than the legislative body itself, its independence, its purity, and even its existence and action may be destroyed, or put into imminent danger. No other body, but itself, can have the same motives to preserve and perpetuate these attributes; no other body can be so perpetually watchful to guard its own rights and privileges from infringement, to purify and vindicate its own character, and to preserve the rights, and sustain the free choice of its constituents." 3 STORY, COMMENTARIES § 831.

The "free choice of its constituents" means that no court and no State may exclude candidates from the range of choices of the people on the basis of a premature adjudication of qualifications. And the district court asserts no basis for entertaining a qualifications challenge.

Cawthorn does not argue that a federal court lacks the power to review his qualifications. That is because he *wants* the federal court to review his qualifications and deem him qualified.

Appellants likewise also do not argue that a federal court lacks the power to review Cawthorn's qualifications. To do so risks undermining their position that the State has the power to review Cawthorn's qualifications.

Both are wrong. Federal courts have no power to review the qualifications of congressional candidates. That's true even though the district court was construing a statutory waiver of an existing disqualification prohibition. The district court construed a statute, but it served as an improper adjudication about Cawthorn's qualifications.

## B. The Constitution grants greater leeway to review the qualifications of presidential candidates.

Federal courts have routinely been asked to weigh in on the eligibility of *presidential* candidates. *See, e.g.*, *Socialist Workers Party of Illinois v. Ogilvie*, 357 F. Supp. 109, 112 (N.D. Ill. 1972); *Hassan v. United States*, 2010 WL 9493338 (E.D.N.Y. June 15, 2010), *aff'd on other grounds*, 441 F. App'x 10 (2d Cir. 2011); *Hassan v. Iowa*, 2012 WL 12974068 (S.D. Iowa

Apr. 26, 2012), *aff'd*, 493 F. App'x 813 (8th Cir. 2012); *Hassan v. New Hampshire*, 2012 WL 405620 (D.N.H. Feb. 8, 2012); *Hassan v. Colorado*, 870 F. Supp. 2d 1192 (D. Colo. 2012), *aff'd*, 495 F. App'x 947 (10th Cir. 2012); *Peace and Freedom Party v. Bowen*, 912 F. Supp. 2d 905 (E.D. Cal. 2012), *aff'd sub nom. Lindsay v. Bowen*, 750 F.3d 1061 (9th Cir. 2014).

But the Constitution's structure distinguishes congressional and presidential qualifications. For members of Congress, "Each House shall be the judge of the elections, returns and qualifications of its own members . . . ." U.S. CONST. art. I, § 5, cl. 1.

There is no similar exclusive congressional power in presidential elections. *Cf.* U.S. CONST. amend. XII (explaining that in presidential elections, "the votes shall then be counted" "in the presence of the Senate and House of Representatives); 167 CONG. REC., 117th, 1st Session, Jan. 6, 2021, at S20 (statement of Senator Mike Lee) ("Yes, we are the election judges when it comes to Members elected to our own body. And, yes, the House of Representatives are the judges of their own races there. . . . There is no corresponding authority with respect to Presidential elections—none whatsoever. It doesn't exist. Our job is to convene, to open the ballots, and to count them. That is it.").

Instead, in presidential elections, "Each state shall appoint, in such manner as the Legislature thereof may direct, a number of electors . . . ." U.S. CONST. art. II, § 1, cl. 2. This power has been construed broadly, including the power to require presidential electors to support particular presidential candidates. *See, e.g.*, *Chiafalo v. Washington*, 140 S.Ct. 2316, 2324 (2020) (calling the State's power "far-reaching" and explaining that "the State's appointment power, barring some outside constraint, enables the enforcement of a pledge like Washington's."). Because there is no textual commitment to Congress to evaluate the qualifications of presidential candidates, States are free to evaluate presidential candidates' qualifications as a part of their electoral appointment power.

Relatedly, while States may adjudicate qualifications for presidential candidates, it has been recognized that they may not add qualifications to presidential candidates. *See, e.g., Nat'l Comm. of the U.S. Taxpayers Party v. Garza*, 924 F. Supp. 71, 75 (W.D. Tex. 1996). *Accord Jones v. Bush*, 122 F.Supp.2d 713, 718 (N.D. Tex. 2000) (holding plaintiffs failed to demonstrate a substantial likelihood of success on the merits of the claim that vice presidential candidate "will be on December 18, 2000, an inhabitant of the state of Texas"). Even if States hold the power to

adjudicate the qualifications of presidential candidates, they cannot add qualifications, including premature adjudication of qualifications.

## CONCLUSION

*Amicus* respectfully submits that the narrow qualification in dispute here functions as an additional qualification for a congressional candidate. On this basis, the judgment of the district court should be affirmed.

Dated: April 21, 2022                Respectfully submitted,

                                                        */s/ Michael Francisco*

                                                        Michael Francisco
                                                        Michael A. Brody
                                                        MCGUIREWOODS LLP
                                                        888 16th Street N.W., Suite 500
                                                        Washington, D.C. 20006
                                                        T: (202) 857-1722
                                                        F: (202) 828-3345
                                                        mfrancisco@mcguirewoods.com
                                                        mbrody@mcguirewoods.com

                                                        *Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5), the type-style requirements of Fed. R. App. P. 32(a)(6), and the type-volume limitations of Fed. R. App. P. 29(a)(5).  The brief is proportionally spaced, has a typeface of 14-point Century Schoolbook font, and contains 4,475 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

*/s/ Michael Francisco*
Michael Francisco

*Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on April 21, 2022, the foregoing was filed with the Clerk of the United States Court of Appeals for the Fourth Circuit using the CM/ECF system.  The system will serve counsel of record.


*/s/ Michael Francisco*
Michael Francisco

*Counsel for Amicus Curiae*