**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

―――――――――

**No. 22-1251**

―――――――――

MADISON CAWTHORN,

        Plaintiff - Appellee,

    v.

BARBARA LYNN AMALFI; LAUREL ASHTON; NATALIE BARNES; CLAUDE
BOISSON; MARY DEGREE; CAROL ANN HOARD; JUNE HOBBS; MARIE
JACKSON; MICHAEL JACKSON; ANNE ROBINSON; DAVID ROBINSON; CAROL
ROSE; JAMES J. WALSH; MICHAEL HAWKINS; MELINDA LOWRANCE; ELLEN
BETH RICHARD; TERRY LEE NEAL,

        Parties-in-Interest - Appellants.

--------------------------------------------------------

CONSTITUTIONAL ACCOUNTABILITY CENTER,

        Amicus Supporting Appellants,

    and

DAMON CIRCOSTA, in his official capacity as Chair of the North Carolina State Board
of Elections; STELLA ANDERSON, in her official capacity as a member of the North
Carolina State Board of Elections; JEFF CARMON, in his official capacity as a member
of the North Carolina State Board of Elections; STACY EGGERS, IV, in his official
capacity as a member of the North Carolina State Board of Elections; TOMMY TUCKER,
in his official capacity as a member of the North Carolina State Board of Elections;
KAREN BRINSON BELL, in her official capacity as the Executive Director of the North
Carolina State Board of Elections,

        Defendants - Amici Curiae,

    and

NORTH CAROLINA REPUBLICAN PARTY,

        Amicus Supporting Appellee,

   and

PROFESSOR DEREK T. MULLER,

        Amicus Curiae.

────────────────

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh. Richard E. Myers, II, Chief District Judge. (5:22-cv-00050-M)

────────────────

Argued: May 3, 2022                             Decided:  May 24, 2022

────────────────

Before WYNN, RICHARDSON, and HEYTENS, Circuit Judges.

────────────────

Reversed, vacated, and remanded by published opinion. Judge Heytens wrote the opinion, in which Judge Wynn joined. Judge Wynn wrote a concurring opinion. Judge Richardson wrote an opinion concurring in the judgment.

────────────────

**ARGUED:** Pressly McAuley Millen, WOMBLE BOND DICKINSON (US) LLP, Raleigh, North Carolina, for Appellants. James Bopp, Jr., THE BOPP LAW FIRM, PC, Terre Haute, Indiana, for Appellee. **ON BRIEF:** Raymond M. Bennett, Samuel B. Hartzell, Scott D. Anderson, Margaret Hayes Jernigan Finley, WOMBLE BOND DICKINSON (US) LLP, Raleigh, North Carolina; Ronald A. Fein, FREE SPEECH FOR PEOPLE, Newton, Massachusetts; John R. Wallace, WALLACE & NORDAN, LLP, Raleigh, North Carolina; James G. Exum, Jr., Greensboro, North Carolina; Robert F. Orr, ORR LAW, Raleigh, North Carolina, for Appellants. Melena S. Siebert, THE BOPP LAW FIRM, PC, Terre Haute, Indiana, for Appellee. Elizabeth B. Wydra, Brianne J. Gorod, Praveen Fernandes, Charlotte Schwartz, CONSTITUTIONAL ACCOUNTABILITY CENTER, Washington, D.C., for Amicus Constitutional Accountability Center. Joshua H. Stein, Attorney General, Amar Majmundar, Senior Deputy Attorney General, Stephanie A. Brennan, Special Deputy Attorney General, Terence Steed, Special Deputy Attorney General, Mary Carla Babb, Special Deputy Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Amici Curiae Defendants. Philip R. Thomas, NORTH CAROLINA REPUBLICAN PARTY, Raleigh, North

Carolina; Kevin J. Cline, KEVIN CLINE LAW, PLLC, Raleigh, North Carolina, for Amicus North Carolina Republican Party. Michael Francisco, Michael A. Brody, MCGUIREWOODS LLP, Washington, D.C., for Amicus Professor Derek T. Muller.

————————

TOBY HEYTENS, Circuit Judge:

In 1868—three years after the end of "the late wicked Rebellion," *Ex parte Milligan*, 71 U.S. 2, 109 (1866)—the Constitution was amended to disqualify from future federal or state office certain public officials "who . . . shall have engaged in insurrection or rebellion against" the United States "or given aid and comfort to the enemies thereof." U.S. Const. amend. XIV, § 3. Four years later, Congress exercised its constitutional authority to "remove such disabilit[ies]," *id.*, by enacting legislation lifting the "political disabilities imposed by" Section 3 of the Fourteenth Amendment "from all persons whomsoever" with the exception of certain high-ranking federal officers who had joined the Confederacy. Act of May 22, 1872, ch. 193, 17 Stat. 142. The issue currently before us is whether that same 1872 legislation also prospectively lifted the constitutional disqualification for all future rebels or insurrectionists, no matter their conduct. To ask such a question is nearly to answer it. Consistent with the statutory text and context, we hold that the 1872 Amnesty Act removed the Fourteenth Amendment's eligibility bar only for those whose constitutionally wrongful acts occurred before its enactment. Accordingly, we reverse the district court's grant of injunctive relief and remand for further proceedings. [1]

---

[1] Representative Cawthorn suggests that this case is moot because unofficial reports from the May 17 primary suggest he will not be the nominee for his party this year. Nevertheless, based on the record before us, this appeal is not currently moot in an Article III sense because a primary winner has not yet been certified and it does not appear the challengers have withdrawn their challenge. See generally N.C. Gen. Stat. § 163-182.5 (describing the process for authenticating primary results); Calendar of Events, https://www.ncsbe.gov/current-sbe-events (setting date to authenticate results for June 9, 2022). And to the extent future developments may bear on any mootness inquiry— including whether a controversy is reasonably likely to recur, see *Kingdomware Techs.,* (continued)

I.

North Carolina law allows "[a]ny qualified voter registered in the same district as the office for which [a] candidate has filed or petitioned" to file a challenge with the state board of elections asserting "that the candidate does not meet the constitutional or statutory qualifications for the office." N.C. Gen. Stat. §§ 163-127.1, -127.2. In January 2022, shortly after the North Carolina state legislature redrew its congressional districts, a group of voters in Representative Madison Cawthorn's district filed such a challenge. According to the voters, Representative Cawthorn encouraged the violent mob that disrupted the peaceful transition of power by invading the United States Capitol on January 6, 2021, and that encouragement constituted "insurrection" and disqualifies Representative Cawthorn for further service in Congress.

Seeking to stop the challenge process from going forward, Representative Cawthorn sued the members of the state board of elections in federal district court. The complaint raises four discrete theories for enjoining the state administrative proceeding, specifically that it: (1) impermissibly burdens Representative Cawthorn's First Amendment right to run for political office; (2) places the burden of proof on Representative Cawthorn in violation of the Due Process Clause; (3) usurps Congress's power under Article I, Section 5 of the

---

*Inc. v. United States*, 579 U.S. 162, 170 (2016)—we are ill-suited to assess such matters on the current record. See, *e.g.*, *North Carolina Right to Life Comm. Fund for Ind. Pol. Expenditures v. Leake*, 524 F.3d 427, 435 (4th Cir. 2008) (appeal involving election regulations is not moot when "there is a reasonable expectation that the challenged provisions will be applied against the plaintiffs again during future election cycles"). Because the district court is better suited to apply this fact-intensive test, we leave any questions about whether the primary results will ultimately moot this case to that court in the first instance.

Constitution to be "the Judge of the . . . Qualifications of its own Members"; and (4) violates the 1872 Amnesty Act.

A week after Representative Cawthorn filed suit, the voters who filed the January challenge with the state board of elections sought leave to intervene as defendants. The district court denied that motion, concluding that the challengers had failed "to overcome the strong presumption" that the state board defendants adequately represented their interests and stating that the challengers' "brief adds little to nothing to the court's consideration of [Representative Cawthorn's] request for preliminary injunctive relief." JA 310, 312.

While this litigation was underway, the North Carolina Supreme Court introduced a procedural wrinkle by ruling that the congressional districts adopted by North Carolina's legislature violated the State's constitution and ordering that replacement maps be adopted. See *Harper v. Hall*, 868 S.E.2d 499, 509–11 (N.C. 2022).[2] After Representative Cawthorn identified the new district in which he intended to run, a group of voters from that district filed materially identical challenges contesting his qualifications on March 2, 2022. One of the original January challengers, Laurel Ashton, remained in Representative Cawthorn's new district and became one of the March challengers as well. Although Representative Cawthorn did not formally amend his complaint to reflect the new challenge and challengers, the parties and the district court treated the complaint and motion for

---

[2] Although a petition for a writ of certiorari from the underlying decision remains pending, the Supreme Court declined to issue a stay. See *Moore v. Harper*, 142 S. Ct. 1089 (2022). As a result, the current maps will be in effect for at least the 2022 election.

preliminary injunction against the January challenge as applying to the March challenge as well.

The state board of elections announced its intent to hold a hearing on March 7, and the district court set a preliminary injunction hearing for three days earlier (March 4). At the hearing, the state board defendants vigorously opposed all of Representative Cawthorn's various claims, including his assertion that entertaining the challenge would violate the 1872 Amnesty Act. At the end of the March 4 hearing, the district court announced it was granting a preliminary injunction with a written opinion to follow. In its oral ruling, the court emphasized that the basis for its injunction was "very narrow" and rested exclusively on the court's "statutory determination" that the 1872 Amnesty Act applied to Representative Cawthorn. JA 475.

Five days later (March 9), the January challengers—including Ashton—filed a notice of appeal of both the order denying their motion to intervene and the district court's grant of a preliminary injunction. The challengers also sought an emergency stay of the district court's injunction pending appeal. The state board defendants neither filed their own appeal nor joined in the challengers' stay request.

The next day (March 10), the district court issued a written opinion that memorialized its conclusion about the 1872 Amnesty Act and stated it was entering "a permanent injunction." JA 509. Once again, the district court emphasized it was "not reach[ing] the constitutional questions" because "it was not necessary to do so." *Id.* The next day, the January challengers—including Ashton—filed an amended notice of appeal that added both the district court's written order and its grant of a permanent injunction.

On March 14—four days after the district court's written order—the state board defendants filed an amicus brief in this Court in response to the challengers' stay motion. That brief advised that the state board of elections was "reviewing the written order to determine whether it will file an appeal" and that, if such an appeal were filed, the state board defendants would not seek "expedited relief" from this Court. ECF 19 at 3.

On March 17, this Court denied the challengers' motion to stay the district court's injunction pending appeal. ECF 33. In the same order, the Court noted that "events since the district court's denial of intervention—including filings before this Court—reveal that circumstances may have changed" since the district court denied the initial motion to intervene. *Id.* at 2. Accordingly, the Court issued "a limited remand . . . to permit appellants to file and the district court to consider a new motion to intervene on an expedited basis." *Id.* at 2–3. The same day, the March challengers (once again including Ashton) filed an "Expedited Renewed Motion to Intervene as Defendants" with the district court. JA 525.

The district court denied that motion to intervene as well, primarily on the ground that it was untimely. Specifically, the court faulted the March challengers for failing to seek intervention immediately following its grant of a preliminary injunction on March 4 or the entry of its written order on March 10. Acknowledging it had already denied a motion to intervene by the identically situated January challengers by the time that window opened, the district court reasoned the March challengers should have predicted that the state board defendants would decline to vigorously pursue appellate relief because the court had ruled on statutory grounds relatively unique to this challenge rather than constitutional grounds with broader implications for the State's processes. The district court further stated

that the delay associated with an appeal by the challengers would "unduly prejudice" Representative Cawthorn and could force him "to respond to 'new' arguments, unanticipated theories, and possible re-litigation of issues already decided." JA 752 (footnote omitted).

Following the district court's denial of their motion to intervene, the March challengers promptly appealed that order along with all the underlying orders on the merits. The state board defendants never filed their own appeal, and the time to do so has now elapsed. See Fed. R. App. P. 4. The state board defendants also have not participated substantively in this appeal, nor did they appear at oral argument.

## II.

This appeal arrives in an unusual procedural posture. The only named defendants covered by the district court's injunction (the state board members) have elected not to appeal, and the only people who seek to challenge the injunction (the various challengers) were denied leave to intervene by the district court. The upshot of this odd situation is that we cannot reach the merits unless we determine the challengers should have been allowed to intervene. For that reason, we begin by addressing two issues related to intervention. The first is Representative Cawthorn's assertion that the challengers lack Article III standing to pursue this appeal. The second is the challengers' assertion that the district court exceeded its discretion in denying their motion to intervene.

## A.

We start with "standing to appeal." *Virginia House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1950 (2019). Because they are the ones invoking the appellate jurisdiction

of this Court, the challengers must demonstrate "that [they] personally ha[ve] suffered some actual or threatened injury." *Diamond v. Charles*, 476 U.S. 54, 62 (1986) (quotation marks omitted). Representative Cawthorn's primary argument about standing is that the challengers cannot establish such an injury because they assert only a generalized grievance shared by all voters in their district. We disagree.[3]

Representative Cawthorn relies on what he perceives as a parallel between the challengers here and the unsuccessful petitioners in *Hollingsworth v. Perry*, 570 U.S. 693 (2013). The *Hollingsworth* petitioners were the "official proponents" of a ballot initiative that successfully amended the California Constitution to provide that "[o]nly marriage between a man and a woman is valid or recognized in California." *Id.* at 701–02 (alteration in original) (quotation marks omitted). The relevant state officials declined to defend the law against a federal constitutional challenge, and the proponents were allowed to intervene to do so. *Id.* at 702. After the district court enjoined enforcement of the law, the state official defendants declined to appeal and the proponents sought to file their own appeal. *Id.* As support for their standing to do so, the proponents claimed that California law gave them a "unique, special, and distinct role in the initiative process—one involving both authority

---

[3] Because of the redrawing of the State's maps, the January challengers other than Ashton no longer reside in Representative Cawthorn's district. As a result, those challengers are no longer eligible to file a challenge under North Carolina law and their claims are thus moot. See N.C. Gen. Stat. §§ 163-127.1, -127.2. In contrast, Ashton has continuously maintained the necessary stake because she filed her current challenge before this appeal was filed.

and responsibilities that differ from other supporters of the measure." *Id.* at 706 (quotation marks omitted).

The Supreme Court was unpersuaded. It was "[t]rue enough," the Court acknowledged, that state law gave the proponents "a unique, special, and distinct role" "when it comes to the process of *enacting* the law," including the responsibility "for collecting the signatures required to qualify the measure for the ballot," "to file the measure with election officials to put it on the ballot," and to "control . . . the arguments in favor of the initiative that would appear in California's ballot pamphlets." *Hollingsworth*, 570 U.S. at 706–07 (emphasis added) (quotation marks omitted). But once the ballot measure became law, the Court emphasized, the proponents "ha[d] no role—special or otherwise— in the [law's] enforcement." *Id.* at 707. Because upholding the law's constitutionality after its enactment "no more directly and tangibly benefit[ed] [the proponents] than it [did] the public at large," the Supreme Court concluded the proponents lacked Article III standing to appeal the district court's injunction. *Id.* at 706 (quotation marks omitted).

Things are different here. The challengers before us do not seek merely to defend the legality of a state law. Instead, their "personal stake" in the outcome of this case, *Hollingsworth*, 570 U.S. at 707 (quotation marks omitted), derives from the still-pending challenge proceeding they filed with the state board of elections that was enjoined by the district court. North Carolina law grants the challengers extensive rights in that proceeding—indeed, rights that are roughly comparable to those of a litigant in court. The board of elections must hold a hearing. N.C. Gen. Stat. § 163-127.4(a). A challenger may take "depositions prior to the hearing" and request "subpoenas for witnesses or

documents." § 163-127.4(a)(2), (3). At the hearing, a challenger may present evidence and examine witnesses. § 163-127.4(c)(1), (2). A challenger who loses may appeal as of right to the North Carolina Court of Appeals, § 163-127.6(b)(1), and then via discretionary review to the North Carolina Supreme Court and the Supreme Court of the United States, see N.C. Const. art. IV, § 12(1); 28 U.S.C. § 1257(a). These challengers thus possess precisely the kind of special "authority and responsibilities" that the *Hollingsworth* petitioners lacked. 570 U.S. at 706 (quotation marks omitted).

To be sure, the "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing." *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009); accord *Spokeo, Inc. v. Robins*, 578 U.S. 330, 342 (2016). But this case does not involve the kinds of purely procedural rights at issue in those cases, which involved decisionmaking procedures (for the government and a credit-reporting firm, respectively) that did not "require [or] forbid any action on the part of" the plaintiffs. *Summers*, 555 U.S. at 493; see also *Spokeo*, 578 U.S. at 335–36. Here, in contrast, the district court's injunction operates directly on the challengers by preventing them, personally, from exercising their rights to engage in discovery and participate in a hearing that would result in a binding adjudication of their claims.[4] And that fact—that the district court's injunction precludes them "from

---

[4] These features of North Carolina law distinguish the notice-and-comment procedures allegedly not followed in *Summers*; there, the government would have been free to disregard any comments filed so long as it acted within the wide latitude afforded by the Administrative Procedure Act. See *Summers*, 555 U.S. at 490, 496–97.

doing [some]thing" in the real world, *Trump v. New York*, 141 S. Ct. 530, 536 (2020) (per curiam) (quotation marks omitted)—gives the challengers the requisite personal stake in this appeal. Cf. *Salazar v. Buono*, 559 U.S. 700, 711–13 (2010) (litigant who secured an injunction had standing to enforce that injunction even if he lacked Article III standing to secure the underlying injunction in the first place).[5]

Nor does it matter whether the challengers' interests in the state process amount to "a 'property' interest protected under the Fourteenth Amendment." Appellee Br. 25. Representative Cawthorn cites no precedent supporting such a requirement, and we are aware of none. On the contrary, the Supreme Court has recognized that even "recreational" or "aesthetic" interests can support standing. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 184 (2000). The injuries that can establish standing are therefore a broader and more diverse category than the interests necessary for due process protections to attach.

## B.

We turn next to whether the district court abused its discretion in denying the motion to intervene. See *Stuart v. Huff*, 706 F.3d 345, 349 (4th Cir. 2013) ("It is well settled that district court rulings on . . . intervention motions are to be reviewed for abuse of

---

[5] In any event, the challengers also have a stake in the outcome of the (now-enjoined) administrative process because it will affect the choices that appear on their ballot. Cf. *Baten v. McMaster*, 967 F.3d 345, 352–53 (4th Cir. 2020), *as amended* (July 27, 2020). Although others in the same district may share that interest, "[t]he fact that an injury may be suffered by a large number of people does not of itself make that injury a nonjusticiable generalized grievance." *Spokeo*, 578 U.S. at 339 n.7; accord *Gill v. Whitford*, 138 S. Ct. 1916, 1930 (2018) (specifically contemplating district-wide injuries).

discretion."). In doing so, we limit our focus to Ashton's March 17 motion because that case for intervention is the most straightforward and Ashton's appeal adequately presents all the issues before us.

We conclude that the district court exceeded the bounds of its discretion in refusing to allow Ashton to intervene after our limited remand. The court denied Ashton's renewed motion principally on timeliness grounds, relying almost exclusively on Ashton's failure to move again to intervene during the eight-day window between when she re-filed her challenge in Representative Cawthorn's new district (March 2) and the date of the district court's written order (March 10). The district court's theory was that—at least after its preliminary injunction ruling on March 4—it was clear that the state board defendants would not seek appellate review because the court had ruled only on a narrow statutory basis rather than a broader constitutional one.

That reasoning, we conclude, constitutes "a clear error in judgment" that renders the denial of intervention an abuse of discretion. *Wesberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999) (quotation marks omitted). The state board defendants vigorously contested Representative Cawthorn's statutory argument both in their pre-hearing briefing and at the preliminary injunction hearing itself and gave no advance indication they would later decline to appeal an adverse ruling on that issue. In fact, at the conclusion of the March 4 hearing, the district court complimented the state board defendants on their thorough arguments, stating they "could not have done a better job . . . in squarely presenting the issues." JA 476.

14

The state board defendants first revealed their decision against expediting any appeal on March 14—four days *after* the end of the period during which the district court concluded that Ashton should have filed a new motion to intervene. On that day, the state board defendants advised this Court that they had not yet decided whether to appeal but, even if they did, they would not seek to expedite review of the district court's order. Because this Court's ordinary processes would not have resulted in an oral argument (much less a decision) on any such appeal until mid-September 2022 at the earliest—and because the entire challenge procedure (including any post-hearing appeals) would still need to take place were such an appeal ultimately to succeed—the state board defendants' decision to forgo seeking an expedited appeal meant there was virtually no possibility that the challengers could obtain meaningful relief from the district court's order before the general election in November.[6]

Although the district court did not separately fault the March challengers for not seeking to intervene between March 14 and March 17, that could not have been a proper basis for denying intervention in any event. By the time the state board defendants disclosed their ambivalence about appealing and their resolve not to expedite any appeal, the district court had entered a permanent injunction that had been appealed to this Court. At least after the March 11 notice of appeal was filed, the district court lacked jurisdiction

_____

[6] The district court attributed the notion that the state election defendants' decision not to seek appellate review was a foregone conclusion to the challengers themselves. But that is not what the challengers argued: Rather, the challengers asserted that the state board defendants' post-injunction filing with this Court exposed the misalignment in the respective interests. JA 530–31.

to consider any new motion to intervene and it continued to lack such jurisdiction until our limited remand on March 17 for the purpose of allowing it to consider such a motion. See *Doe v. Public Citizen*, 749 F.3d 246, 258 (4th Cir. 2014) ("hold[ing] that an effective notice of appeal divests a district court of jurisdiction to entertain an intervention motion").

In addition to its erroneous determination that the March challengers' motion to intervene was untimely, the district court also exceeded the bounds of its discretion in concluding that intervention would "prejudice" Representative Cawthorn by subjecting him to "'new' arguments, unanticipated theories, and possible re-litigation of issues already decided." JA 752 (footnote omitted). By that point, the district court had already concluded that the challengers' arguments on the statutory issue added "little to nothing" to what the state board defendants had already argued. JA 312. And to the extent our review of the district court's decision could be characterized as "re-litigation of issues already decided," that is part of the ordinary course of litigation rather than legally cognizable "prejudice." JA 752; see *SAS Inst., Inc. v. World Programming, Ltd.*, 952 F.3d 513, 523 (4th Cir. 2020) ("A district court abuses its discretion if it relies on an error of law[.]") (quotation marks omitted).

At this point, our general practice would be to remand for the district court to redo the intervention analysis free from the previous errors. Under the circumstances, however, we see no reason to do so. Now that the state board defendants' time to appeal has elapsed, there is no serious argument against permissive intervention. Ashton plainly has "a claim or defense that shares with the main action a common question of law or fact," and no party currently represents that interest. Fed. R. Civ. P. 24(b)(1)(B). We therefore reverse the

denial of intervention as to Ashton, clearing the way for us to address her appeal of the district court's underlying orders. See Wright & Miller, 15A Fed. Prac. & Proc. Juris. § 3902.1 (2d ed. 2022); *Ross v. Marshall*, 426 F.3d 745, 761 & n.68 (5th Cir. 2005).

III.

Although this appeal is properly before us, there remain three threshold issues to consider before we may reach the merits of the district court's analysis of the 1872 Amnesty Act.

A.

Because Representative Cawthorn was the plaintiff in the district court, we must assure ourselves he had standing to bring this action in the first place. See *Buscemi v. Bell*, 964 F.3d 252, 258 (4th Cir. 2020).

Although the district court concluded that Representative Cawthorn had standing, its analysis contained a significant gap. Recall that Representative Cawthorn brought several distinct claims, including (as relevant here) that the challenge proceedings would violate both the First Amendment and the 1872 Amnesty Act. The district court concluded that Representative Cawthorn had standing based solely on an ostensible First Amendment injury—namely, a burden on his right to run for office. But the court then granted relief on an entirely different basis, specifically its conclusion that the challenge process would violate the 1872 Amnesty Act.

That analysis missed a step. "[S]tanding is not dispensed in gross," but must be alleged and proven "for each claim" a plaintiff "seeks to press." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (quotation marks omitted). Representative

Cawthorn's standing to pursue his First Amendment challenge thus did not necessarily encompass standing to pursue a different claim based on the 1872 Amnesty Act.

All the same, we conclude that Representative Cawthorn has Article III standing to pursue his 1872 Amnesty Act claim. In Representative Cawthorn's view, that Act prohibits not just a particular result—disqualifying him from the ballot—but also applying the State's challenge process to him in the first place. See JA 38 ("The Challenge Section, as applied to Rep. Cawthorn under Section Three of the Fourteenth Amendment, violates [the 1872 Amnesty Act]."); accord Oral Arg. 45:20–45:32. There may be reason to question that proposition because the Act's text says nothing about the *process* for determining whether a disability has been lifted. See p. 22, *infra* (quoting the full statute). But that problem—if it exists—goes to the merits of Representative Cawthorn's claim under the 1872 Amnesty Act rather than his standing to press it. Representative Cawthorn asserts an existing injury-in-fact (being subjected to North Carolina's challenge process) that is directly traceable to what he claims is a violation of a particular law (the 1872 Amnesty Act) and would be redressed by the requested relief (an injunction against the challenge process going forward). Nothing more is needed to establish standing to sue. See *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

## B.

We also conclude that the case's current posture does not require us to rule on any nonjusticiable political questions. "A controversy is nonjusticiable—*i.e.*, involves a political question—where there is" either "a textually demonstrable constitutional commitment of the issue to a coordinate political department" or a "lack of judicially

18

manageable standards" for resolving the issue. *Nixon v. United States*, 506 U.S. 224, 228 (1993) (quotation marks omitted). One of Representative Cawthorn's claims is that allowing the North Carolina board of elections to determine whether he is disqualified from office under Section 3 of the Fourteenth Amendment would unconstitutionally trench upon a power that has been textually committed to the House of Representatives—namely, its authority to "be the Judge of the . . . Qualifications of its own Members" under Article I, Section 5. If Representative Cawthorn is right about the meaning of Article 1, Section 5— a question we do not reach—one may wonder whether the scope of the 1872 Amnesty Act is also a nonjusticiable political question.

It is not. For one thing, resolving whether a particular "interpretation of [a] statute"—here, the 1872 Amnesty Act— is correct represents a "familiar judicial exercise," one for which there is a superabundance of tools that federal judges employ every day. *Zivotofsky v. Clinton*, 566 U.S. 189, 196 (2012). And the political question doctrine does not excuse courts from performing their usual work "merely because the issues have political implications." *Id.* at 196 (quotation marks omitted).

*Zivotofsky* itself provides a good illustration. There, the D.C. Circuit refused to adjudicate whether Congress could require the State Department to list a birthplace on a passport as "Israel" when the person was born in Jerusalem. 566 U.S. at 193–94. The Supreme Court reversed, faulting the court of appeals for refusing to adjudicate a straightforward separation-of-powers question based on the generalized idea that the case might involve "an area of decisionmaking" committed to another branch. *Id.* at 194–95 (quotation marks omitted). As the Court noted, "constitutional interpretation"—like

statutory construction—involves "familiar principles" (such as "careful examination of the textual, structural, and historical evidence put forward by the parties") that are the bread-and-butter of judicial work. *Id.* at 201.

If there is a political question here, then, it rests not on a lack of judicially manageable standards but a "textually demonstrable constitutional commitment" of the question to Congress. *Nixon*, 506 U.S. at 228. But the Supreme Court has already spoken about the scope of any such commitment in Article I, Section 5, stating that that provision "is *at most* a 'textually demonstrable commitment' to Congress to judge only the qualifications expressly set forth *in the Constitution*." *Powell v. McCormack*, 395 U.S. 486, 548 (1969) (emphasis added).[7] The question currently before us, however, is not whether Section 3 of the Fourteenth Amendment would (or would not) disqualify Representative Cawthorn from future federal or state service, and this appeal cannot result in an order declaring Representative Cawthorn constitutionally qualified (or unqualified) for further service in the House of Representatives. Instead, the question before us is: *Regardless* of whether Section 3 would otherwise disqualify Representative Cawthorn, does the 1872 Amnesty Act nevertheless authorize him to serve? And under *Powell* and *Zivotofsky*, Representative Cawthorn's effort to "vindicate" that alleged "statutory right" raises no nonjusticiable political question. *Zivotofsky*, 566 U.S. at 195.

---

[7] The Court specifically reserved whether the "disability" imposed by Section 3 of the Fourteenth Amendment is a "Qualification" within the meaning of Article I, Section 5. See *Powell*, 395 U.S. at 520 n.41. We assume without deciding that it is.

C.

Representative Cawthorn also contends that the challengers lack "a private cause of action" to raise Section 3 of the Fourteenth Amendment in federal court. Appellee Br. 26. That gets things backwards. The challengers are not the plaintiffs in this suit, Representative Cawthorn is. And it is the plaintiff—not the defendant—who must have a cause of action to seek relief in federal court. Indeed, "once a case or controversy properly comes before a court," a defendant may raise federal defenses because "judges are bound by federal law" and "may not hold a civil defendant liable" in violation of it. *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 326 (2015).[8]

IV.

Having cleared the procedural underbrush, we arrive at the merits of the district court's reading of the 1872 Amnesty Act. Reviewing the court's interpretation de novo, see, *e.g.*, *Fairfax v. CBS Corp.*, 2 F.4th 286, 296 (4th Cir. 2021), we conclude that it erred in construing the Act as a sweeping removal of all future Fourteenth Amendment disabilities.

---

[8] To the extent there may be a lurking cause of action problem here, it involves Representative Cawthorn, not the challengers. Although 42 U.S.C. § 1983 provides Representative Cawthorn with a cause of action to pursue his various constitutional claims, not all federal statutes may be enforced using that mechanism. See, *e.g.*, *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002). For that reason, the challengers may (or may not) have had an argument that Representative Cawthorn has no cause of action to pursue his claim that the challenged proceedings would violate the 1872 Amnesty Act. Because the challengers have not raised this point—and because it does not impact either our subject-matter jurisdiction or that of the district court, see *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 n.4 (2014)—we do not further consider it.

"We begin," as always, "with the text." *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163, 1169 (2021). And because the 1872 Act has the "merit of brevity," *Foster v. Goddard*, 66 U.S. 506, 507 (1861), we quote it in full:

> *Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled (two-thirds of each house concurring therein)*, That all political disabilities imposed by the third section of the fourteenth article of amendments of the Constitution of the United States are hereby removed from all persons whomsoever, except Senators and Representatives of the thirty-sixth and thirty-seventh Congresses, officers in the judicial, military, and naval service of the United States, heads of departments, and foreign ministers of the United States.

17 Stat. 142.

The most fundamental problem with Representative Cawthorn's proposed interpretation is that the Act's operative clause refers to those "political disabilities *imposed*" in the past tense rather than new disabilities that might arise in the future. The past tense is "backward-looking"; it refers to things that have already happened, not those yet to come. *Cullen v. Pinholster*, 563 U.S. 170, 181–82 (2011). Of course, we must consider the text not just as a modern reader would but also its "plain meaning at the time of enactment." *Tanzin v. Tanvir*, 141 S. Ct. 486, 491 (2020). But Representative Cawthorn has not argued that this elementary rule of conjugation has changed in the last hundred and fifty years—likely with good reason. Cf. *Blair v. City of Chicago*, 201 U.S. 400, 465 (1906) ("This declaration is in the past tense, and can have no reference by any fair construction to future engagements.").

Representative Cawthorn ventures no direct rebuttal to this straightforward principle of grammar. Instead, he notes that, as used in the 1872 Amnesty Act, "imposed" functions as a "participle" because it occurs in an adjectival phrase modifying

"disabilities." Appellee Br. 30. True enough, but that is beside the point. As Representative Cawthorn ultimately acknowledges, participles are a *form* of verbs—a form that comes in both "past" and "present" varieties. *Id.* at 30 n.5; accord *Webster's Third International* 1646 (Philip Babcock Gove ed., 2002) (defining "participle" as "a word having the characteristics of both verb and adjective; *esp*: the English verbal adjective . . . that has the function of an adjective and at the same time shows such verbal features as tense and voice and capacity to take an object"). Here, Congress employed the past-tense version, indicating its intent to lift only those disabilities that had by then been "imposed." Cf. *Costello v. INS*, 376 U.S. 120, 123–24 (1964) (referring to the past participle in "have been" as a "use of the past tense" (quotation marks omitted)).

The operative clause's principal verb—"removed"—reinforces this conclusion. In the mid-nineteenth century, as today, that word generally connoted taking away something that already exists rather than forestalling something yet to come. *Dr. Webster's Complete Dictionary of the English Language* 1116 (Chauncey A. Goodrich & Noah Porter, eds., 1864) (defining "remove" when used as a verb: "To cause to change place; to move away from the position occupied; *to displace*." (emphasis added)).

Given all this, the district court's focus on the 1872 Amnesty Act's use of "all persons whomsoever"—which formed nearly the entire basis for its ruling—was misplaced. Without question, that phrase conveys broad action, and granting political amnesty to nearly all ex-Confederates in one fell swoop surely was a remarkable act. But the subject of the relevant sentence is the "disabilities" that are being "removed." Thus, to understand what Congress did, we must look to any phrases modifying those "disabilities."

And that, in turn, brings us back to where we began: the fact that Congress did not purport to "remove[ ]" any disabilities that had not yet been "imposed."

The Act's history and context further confirm the point. The district court attributed to the 1872 Congress a grand, structural purpose, specifically, a desire "to reserve [for itself ] the right to decide whether one of its members has engaged in insurrection." JA 492. That atextual conjecture, however, suffers from at least two serious problems.

For one thing, it is not clear that the purpose hypothesized by the district court is consistent with the text of the 1872 Amnesty Act. As its popular name suggests, that Act provides—consistent with the grant of authority in Section 3 of the Fourteenth Amendment—that "all political disabilities imposed by" that provision are "*hereby* removed." 17 Stat. 142 (emphasis added). Nothing in the Act's text reserves to a future Congress the "right to decide whether one of its members has engaged in insurrection." JA 492. And once a given Congress has exercised its constitutional authority to lift a particular disability, it is at minimum unclear on what basis a future Congress might later refuse to seat a member on the theory that the previously rescinded disability nonetheless remains.

In any event, the district court cited no evidence that Congress had such a procedure in mind when it voted for amnesty. To the contrary, the available evidence suggests that the Congress that enacted the 1872 Amnesty Act was, understandably, laser-focused on the then-pressing problems posed by the hordes of former Confederates seeking forgiveness. See Gerard N. Magliocca, *Amnesty and Section Three of the Fourteenth Amendment*, 36 Const. Comment. 87, 111–21 (2021). Those problems were partly logistical: Using individual "private bills to remove Section Three disabilities" fostered "favoritism," and

24

the "thousands" of applications threatened to "overwhelm[]" Congress. *Id.* at 112; accord *Cong. Globe*, 42d Cong., 2d Sess. 3253 (1872) (Senator Pratt) ("[T]he exclusion of these men from office is a fruitful source of discontent . . . . These disabled people are constant grumblers. They parade their griefs every day."). But matters of principle were also at stake, because President Grant and others argued that keeping large categories of people out of office was ineffective in excluding noxious ideas if those ideas were held by a majority of their constituents. See Magliocca at 115–16. And even though the debates over amnesty occupy scores of pages in the *Congressional Globe*,[9] neither the district court nor Representative Cawthorn has cited any statement by any member of Congress referencing the treatment of future insurrectionists.[10]

This historical context materializes in the 1872 Amnesty Act's text through its enumerated list of exceptions. Those exceptions—which carved out "Senators and Representatives of the thirty-sixth and thirty-seventh Congresses, officers in the judicial, military, and naval service of the United States, heads of departments, and foreign ministers of the United States," 17 Stat. 142—reflect Congress's judgment that certain ex-Confederates had been sufficiently wicked to warrant continued exclusion from public office. See Magliocca at 120 (noting that, in 1872, "Section Three relief for [Jefferson]

---

[9] See, *e.g.*, *Cong. Globe*, 42d Cong., 2d Sess. 237–41, 245–49, 263–81, 381–91, 429–37, 487–97, 522–32, 585–90, 698–703, 705–07, 726–31, 758–67, 819–28, 842–48, 869–80, 891–902, 909–28, 1908–14, 3179–98, 3249–70, 3736–38 (1872).

[10] A critical sticking point in congressional negotiations was whether amnesty should be passed in conjunction with expanded civil rights protections for African Americans. Magliocca at 117–21. Congress ultimately adopted amnesty as a standalone measure. See *id.* at 119.

Davis and the highest ex-Confederates was still deeply unpopular in the North"); see also *Cong. Globe*, 42d Cong., 2d Sess. 7 (1871) (annual message to Congress of President Grant) ("If there are any great criminals, distinguished above all others for the part they took in opposition to the Government, they might, in the judgment of Congress, be excluded from such an amnesty."). Having specifically decided to withhold amnesty from the *actual* Jefferson Davis, the notion that the 1872 Congress simultaneously deemed any future Davis worthy of categorical advance forgiveness seems quite a stretch.

Beyond its implausibility, Representative Cawthorn's proposed interpretation of the 1872 Amnesty Act also would raise potentially difficult questions about the outer limits of Congress's power under Section 3 of the Fourteenth Amendment. That provision's first sentence prohibits further federal or state service by persons who "have engaged in" certain activities, and its second sentence provides that Congress may "remove such disabilit[ies]" by a two-thirds vote of each chamber. U.S. Const. amend. XIV, § 3. As noted previously, the verb "remove" generally connotes taking away something that has already come into being. See p. 23, *supra*. And even the President's somewhat analogous pardon authority—which the Supreme Court has called virtually "unlimited"—is generally understood to be exercisable only "*after* [the] commission" of the offense in question. *Ex parte Garland*, 71 U.S. 333, 380 (1866) (emphasis added). If "serious constitutional doubts" can offer a reason to prefer one of two "competing plausible interpretations of statutory text," *Clark v. Martinez*, 543 U.S. 371, 381 (2005), we certainly should not strain the text of the 1872 Amnesty Act to introduce such doubts when a clearly more plausible grammatical reading avoids them entirely.

The district court also briefly suggested that a subsequent amnesty removing disabilities from certain high-ranking rebel officials who had not been covered by the 1872 Amnesty Act might bear on the question here. JA 510. That 1898 Act lifted, without exception, any "disability . . . heretofore incurred" under Section 3. See Act of June 6, 1898, ch. 389, 30 Stat. 432.

Although that language perhaps even more clearly limits its effect to disabilities "incurred" before its enactment, Congress's choice of phrasing in 1898 sheds little light on what a different Congress meant in 1872. As the Supreme Court has cautioned, subsequent legislative practice is "a 'particularly dangerous' basis on which to rest an interpretation of an existing law" adopted by an "earlier Congress." *Bostock v. Clayton County*, 140 S. Ct. 1731, 1747 (2020). Such warnings are especially apt where, as here, the subsequent history points in both directions. In 1919, for example, the House of Representatives voted to exclude Victor Berger under Section 3 on the ground that, as a supporter of socialism who had been convicted of violating the Espionage Act, he had given aid or comfort to America's enemies. See Clarence Cannon, 6 *Cannon's Precedents of the House of Representatives of the United States* 57–58 (2d ed. 1935). In so doing, the House rejected the notion that the 1898 amnesty had absolved Berger, but not primarily based on its use of "heretofore incurred." *Id.* at 55. Instead, that phrase merely reflected the 1919 Congress's view that "Congress in the very nature of things *would not have the power* to remove any future disabilities." *Id.* at 55 (quotation marks omitted) (emphasis added).

These breadcrumbs only reinforce why the text and context of the 1872 Amnesty Act must be our principal guide. And, together, those features lead us to conclude that Act

did not prospectively immunize Representative Cawthorn—or anyone else—from Section 3's reach.

\*     \*     \*

Because the district court's ruling was based solely on its view of the 1872 Amnesty Act, we reverse its decision and vacate the permanent injunction. See *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund*, 527 U.S. 308, 314 (1999) (stating that an appeal from a preliminary injunction "becomes moot" after entry of "a permanent injunction, because the former merges into the latter"). The parties urge us to take up Representative Cawthorn's remaining arguments, but our usual course is to "remand for resolution of any claims" a district court's "error prevented [it] from addressing." *Zivotofsky*, 566 U.S. at 201. The fact that the unresolved claims here involve weighty and unsettled constitutional questions provides all the more reason to adhere to that sound practice.

A few words about what we have not decided. We express no opinion about whether Representative Cawthorn in fact engaged in "insurrection or rebellion" or is otherwise qualified to serve in Congress. We likewise do not consider whether Article I, Section 5 of the Constitution reserves such determinations exclusively to the House of Representatives or whether States may play any role in regulating ballot access based on constitutional qualifications under the Time, Place, and Manner Clause of Article I, Section 4. Cf. *Roudebush v. Hartke*, 405 U.S. 15, 24–26 (1972) (discussing that interaction). Nor do we reach Representative Cawthorn's Due Process and First Amendment claims. We hold only that the 1872 Amnesty Act does not categorically exempt all future rebels and

28

insurrectionists from the political disabilities that otherwise would be created by Section 3

of the Fourteenth Amendment. The judgment of the district court is therefore

*REVERSED, VACATED,*
*AND REMANDED.*

WYNN, Circuit Judge, concurring:

I fully concur in Judge Heytens's well-reasoned and persuasive majority opinion. But Judge Richardson's provocative and novel concurrence compels a correcting response.

To begin, the issue in this matter is not, as the concurrence indicates, "whether Representative Cawthorn meets the requirements of" Section 3 of the Fourteenth Amendment.[1] Richardson Op. at 68. Instead, as the majority opinion ably explains, the issue that we decide today—and the question that goes to the heart of the district court's permanent injunction—is a narrow one: does the 1872 Amnesty Act bar the State of North Carolina from hearing a challenge to Representative Cawthorn's candidacy for congressional office based on Section 3? The answer is a resounding "no."

But more concerningly, the concurrence broadly creates a flawed blueprint for courts to stonewall the reasonable efforts of States to prevent frivolous *candidates* from running for congressional office. Neither the Constitution, nor Supreme Court precedent, nor common sense supports that irrational result.

---

[1] The concurrence gets to this issue by framing its analysis in jurisdictional terms. And in its view, the district court, by interpreting the scope of a federal *statute*—something it is well-equipped to do—somehow ended up "impl[iedly]" "judging" Representative Cawthorn's "*constitutional* qualifications for office," which it lacked jurisdiction to do. Richardson Op. at 68–70 (emphasis added).

But the district court did no such thing. It did not assess whether Representative Cawthorn had "engaged in insurrection or rebellion" against the United States, or whether he had "given aid or comfort to the enemies thereof." U.S. Const. amend. XIV, § 3. It did not even determine whether Representative Cawthorn previously undertook an oath "to support the Constitution." *Id.* Instead, the court deliberately declined to do those things. And even if it had wanted to, this case simply "cannot result in an order declaring Representative Cawthorn constitutionally qualified (or unqualified) for further service in the House of Representatives," Majority Op. at 20, despite the concurring opinion's repeated statements to the contrary.

I.

The concurrence proposes to interpret Article I, Section 5 to determine whether *federal courts* have jurisdiction to judge a candidate's constitutional qualifications. But though the concurring opinion claims that it is *not* deciding whether the *State of North Carolina* may judge a candidate's constitutional qualifications—since that issue, we all agree, "is not before this court yet," *id.* at 69 n.22—the opinion is littered with broad statements that apply its reasoning with full force to the States, *see id.* at 54 ("[O]nly Congress—*not the states*, and not the courts—may judge the qualifications of members or would-be members[.]" (emphasis added)). Indeed, the concurring opinion concludes that "*any* attempt" by the States "to *regulate candidates or ballot access* for federal office" in a substantive manner "is an implicit attempt to regulate the qualifications of members of Congress, which is not allowed." *Id.* (emphases added).

In other words, the concurrence believes that every State in the Union is completely powerless to regulate candidates or ballot access. No court has ever held that view. Nor has any court ever held that Article I, Section 5 prevents States from enacting eminently reasonable measures to prevent twelve-year-olds or noncitizens, for example, from running for congressional office. Yet that is precisely what the concurring opinion—as well as counsel for Representative Cawthorn—argues the Constitution requires.

Because the premises underlying this conclusion are flawed as a matter of law and common sense, I respectfully must disagree with my fine colleague who concurs separately.

31

A.

To start, the concurring opinion's conclusion—that "only Congress—*not the states*, and not the courts—may judge the qualifications of members *or would-be members*," *id.* (emphases added)—is textually flawed. Article I, Section 5 simply does not say that. To the contrary, States have typically enjoyed broad powers to regulate *candidates* pursuant to the Elections Clause.

1.

The text of Article I, Section 5, Clause 1 plainly reads: "Each House shall be the Judge of the Elections, Returns and Qualifications *of its own Members*." U.S. Const. art. I, § 5, cl. 1 (emphasis added). Nothing in the text of that clause says anything about "candidates," "prospective Members," "would-be [M]embers," and the like. *See* Richardson Op. at 53–54. By its clear terms, it only applies to Congress's "*own Members*"—those individuals elected or appointed to our national legislative body.

If we can agree that Congress only possesses those powers enumerated in the Constitution, then the Framers' decision to refer to "*Members*" alone must mean that Congress, by negative implication, lacks exclusive control to judge the qualifications of *non*members, including candidates. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 534 (2012) ("The enumeration of powers is also a limitation of powers, because '[t]he enumeration presupposes something not enumerated.'" (quoting *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 195 (1824))); *cf. Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives*, 5 F.4th 407, 421 (4th Cir.) (Richardson, J.) (explaining that the Framers' decision not to include an age restriction in the Second Amendment suggested that no such

restriction existed), *vacated as moot*, 14 F.4th 322 (4th Cir. 2021). That result is commanded by the text, plain and simple.

Instead of heeding the text, the concurrence employs a workaround syllogism to reach a different result. That syllogism begins with the major premise that, pursuant to Article I, Section 5, Congress possesses the exclusive power to judge the qualifications of its members. Richardson Op. at 41–51. It then creates its own minor premise that there is no "meaningful difference between candidates and 'Members.'" *Id.* at 52–54. Having set up that strawman, it casually concludes that Congress must possess exclusive power to judge the qualifications of candidates.

That workaround syllogism cannot stand because even if we assume that the major premise is sound,[2] the minor premise is plainly invalid. That premise presupposes that the Constitution was unartfully drafted, and that the Framers must have mistakenly omitted "candidates" or "would-be Members" from Article I, Section 5. But it is well established

---

[2] While the major premise—that Section 5 grants Congress the exclusive power to judge the qualifications of its members—may seem uncontroversial, it is not quite as clear as the concurring opinion makes it out to be. To start, the plain text of Article I, Section 5, Clause 1 does not say that each House of Congress shall be the "sole" or "exclusive" judge of its members' qualifications. It only says "the Judge." U.S. Const. art. I, § 5, cl. 1. As the concurring opinion points out, "the" could be interpreted to mean "the *particular* Judge." Richardson Op. at 45 n.4 (emphasis added). But the Supreme Court has never squarely adopted this reading. *Id.* at 44 n.3.

To be sure, at times the Court has suggested in dicta that Congress possesses the "sole authority" to judge its members' qualifications. *See, e.g.*, *Barry v. United States ex rel. Cunningham*, 279 U.S. 597, 619 (1929). But at other times it has said that Congress is only entitled to the "*final say* in judging the qualifications of the representatives of any one State," not necessarily the *only* say. *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 804 (1995) (emphasis added); *see also id.* at 811 (noting that Article I, Section 5 vests Congress with the "*ultimate* authority to judge a Member's qualifications" (emphasis added)).

that when judges construe the powers granted to the Federal Government by the Constitution, we start by assuming that the Framers meant what they said. And if the Framers expressly conferred "some powers" on Congress, but not others, we must conclude those other powers have not been granted. *Sebelius*, 567 U.S. at 534; *see also McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 405 (1819) (holding that Congress "can exercise only the powers granted to it").

To work around that established canon of constitutional construction, the concurring opinion counters that even if the Constitution has not *textually* committed an exclusive power over candidate qualifications to Congress, judges can nevertheless glean an *implied* exclusive power over candidate qualifications from Supreme Court precedent. To wit, it claims that in two cases—*U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779 (1995), and *Cook v. Gralike*, 531 U.S. 510 (2001)—the Court has "twice refused to draw [a] line between candidates and 'Members.'" Richardson Op. at 52. Since these two categories are coextensive, it reasons, the exclusive power granted to Congress to judge the qualifications of its members must extend to candidates as well.

Not so. *Thornton* and *Cook* hardly establish that "candidates" and "Members" are one and the same. Instead, these cases stand for the unremarkable proposition that States cannot impose candidate qualifications that effectively add to the Constitution's exclusive list of membership qualifications. *See Thornton*, 514 U.S. at 836 (holding that "a state amendment" regulating ballot access "is unconstitutional when it has the likely effect of handicapping a class of candidates and has the sole purpose of creating additional qualifications indirectly"); *Cook*, 531 U.S. at 525–26 (holding that a state ballot measure

that indirectly added a new qualification was unconstitutional). Neither decision erases the distinction between "*candidates*" and "*Members.*" And neither opinion holds that States are completely powerless to police *candidates* using the qualifications *in* the Constitution.

2.

Given that neither the text of the Constitution nor Supreme Court precedent has extended to Congress an exclusive power to regulate the qualifications of congressional *candidates*, that should end our inquiry. But that outcome is also compelled by asking and answering a different question: what power does the Constitution grant States to regulate candidates?

The answer lies in the Elections Clause. That clause prescribes that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof." U.S. Const. art. I, § 4, cl. 1. According to well-settled law, this clause grants to the States "broad powers" to regulate elections. *Roudebush v. Hartke*, 405 U.S. 15, 25 (1972). "It cannot be doubted" that these broad powers "embrace authority to provide a complete code for congressional elections," including the power "to enact the numerous requirements as to procedure and safeguards which experience shows are necessary in order to enforce the fundamental right involved." *Smiley v. Holm*, 285 U.S. 355, 366 (1932). Hence, the Supreme Court has "upheld generally applicable and evenhanded [ballot-access] restrictions that protect the integrity and reliability of the electoral process itself." *Anderson v. Celebrezze*, 460 U.S. 780, 788 n.9 (1983).

To be sure, at times the Court has seemed to suggest that the powers granted by the Elections Clause are purely procedural. *See, e.g.*, *Thornton*, 514 U.S. at 833 (noting that "the Framers understood the Elections Clause as a grant of authority to issue procedural regulations"). But for at least fifty years, the Supreme Court has repeatedly held that the Elections Clause gives States the power to "protect the integrity of its political processes from *frivolous or fraudulent candidacies*." *Storer v. Brown*, 415 U.S. 724, 733 (1974) (emphasis added) (quoting *Bullock v. Carter*, 405 U.S. 134, 145 (1972)); *see also Thornton*, 514 U.S. at 834 (same); *Munro v. Socialist Workers Party*, 479 U.S. 189, 194–95 (1986) ("We have never required a State to make a particularized showing of the existence of voter confusion, ballot overcrowding, or the presence of frivolous candidacies prior to the imposition of reasonable restrictions on ballot access.").

In short, reading these precedents together, the Supreme Court indicates that (1) States are empowered to weed out *candidacies* that lack merit (2) so long as, in doing so, they do not impermissibly add to the Constitution's exclusive list of membership qualifications. *See Thornton*, 514 U.S. at 834. Therefore, because *candidates* who clearly fail to satisfy the Constitution's age, citizenship, or residency requirements[3] (1) lack merit and (2) can be turned away without adding to the qualifications for congressional

---

[3] *See* U.S. Const. art. I, § 2, cl. 2 ("No Person shall be a Representative who shall not have attained to the Age of twenty five Years, and been seven Years a Citizen of the United States, and who shall not, when elected, be an Inhabitant of that State in which he shall be chosen."); *id.* § 3, cl. 3 (similar qualifications for Senators). I refer only to the familiar three qualifications enumerated in Article I, Sections 2 and 3 because whether Section 3 of the Fourteenth Amendment is a constitutional qualification remains an open question. *See* Richardson Op. at 55.

membership—since those three qualifications are in the Constitution itself, *see* U.S. Const. art. I, § 2, cl. 2; *id.* § 3, cl. 3—there is no constitutional issue with States policing those requirements.

At the end of the day—whether we ask how far Congress's power extends under Article I, Section 5, or whether we examine how far States' powers extend under the Elections Clause—we arrive at the same conclusion: to the extent Congress possesses the power to judge the qualifications of candidates, that power is not exclusive.

## B.

Finally, we must consider the common-sense meaning of Article I, Section 5. After all, "[t]here is no war between the Constitution and common sense." *Mapp v. Ohio*, 367 U.S. 643, 657 (1961).

If the concurring opinion is correct that "*any* attempt" by the States "to regulate candidates or ballot access for federal office is an implicit attempt to regulate the qualifications of members of Congress, which is not allowed," Richardson Op. at 54 (emphasis added); *see also id.* at 54 n.10 (opining that state "ballot access" measures "cannot be meaningfully distinguished from [unconstitutional] attempts to add qualifications"), then every "state would be powerless to prevent" "fraudulent or unqualified candidates such as minors, out-of-state residents, or foreign nationals" from running for office. *Greene v. Raffensperger*, -- F.Supp.3d --, 2022 WL 1136729, at *27 (N.D. Ga. Apr. 18, 2022). It is hard to believe the State legislatures that ratified the Constitution signed up for such a charade.

For instance, under the concurring opinion's reading of Article I, Section 5, States would be powerless to judge or investigate whether someone *even lives in the State they are running in*. The concurrence dismisses this as a "sky-is-falling argument." Richardson Op. at 50. But recent history reveals that it is all too real. *See* Stephanie McNeal, *Republican Candidate Running for Congress in 4 Different States*, Fox News (Dec. 20, 2015), https://www.foxnews.com/politics/republican-candidate-running-for-congress-in-4-different-states (describing one recent congressional candidate's efforts to run in "his home state of Georgia—as well as Michigan, Minnesota and Hawaii") (saved as ECF opinion attachment 2); *see also* Brian Slodysko & Tom Davies, *Records: Trey Hollingsworth Was Obligated to Live in 5 States*, IndyStar (Nov. 2, 2016), https://www.indystar.com/story/news/politics/2016/11/02/records-trey-hollingsworth-obligated-live-states/93177642/ (reporting that a recent candidate for a U.S. House seat in Indiana had filed legal documents that suggested he lived in Virginia, North and South Carolina, Georgia, and Ohio, but not Indiana) (saved as ECF opinion attachment 3); Jacob Pramuk, *Dr. Oz Will Run for Pennsylvania's Open Senate Seat as a Republican*, CNBC (Nov. 30, 2021), https://www.cnbc.com/2021/11/30/dr-oz-will-run-for-senate-in-pennsylvania-as-a-republican.html (reporting that a candidate running for one of Pennsylvania's U.S. Senate seats has "lived in New Jersey for two decades" and only recently registered to vote in the Keystone State—using "his in-laws' address") (saved as ECF opinion attachment 4).

Furthermore, the concurring opinion's interpretation of Article I, Section 5 would also frustrate familiar principles of comity and federalism. *See Younger v. Harris*, 401 U.S.

37, 44 (1971) (describing "Our Federalism" as a "system in which there is sensitivity to the legitimate interests of both State and National Governments"). States undoubtedly have a stake in ensuring that their interests and the interests of their citizens are represented by qualified congressional candidates. *Storer*, 415 U.S. at 733 (recognizing "a State has an interest, if not a duty, to protect the integrity of its political processes from frivolous or fraudulent candidacies" (quoting *Bullock*, 405 U.S. at 145)). Surely, State governments are at least as capable as Congress is of determining the age, citizenship, and residency status of congressional *candidates*—if not more so.[4]

## II.

In sum, the text of the Constitution does not grant Congress the exclusive power to judge candidate qualifications. However, under the Elections Clause, the Constitution does grant States broad powers to regulate candidates and ballot access.

And it stands to reason that as a matter of common sense, and as a matter of comity, our Constitution permits States to have a say in regulating the candidates who seek to represent their interests and the interests of their citizens.

---

[4] The concurring opinion's conclusion would mean that States would be powerless to keep an out-of-state resident or a foreign national from being listed on their ballots as a *candidate* for congressional office. Instead, the concurring opinion believes only *Congress* is empowered to disqualify patently unqualified *candidates* from running for office. But it is improbable to think that Congress would waste its time policing candidate qualifications. That would leave congressional elections in legal limbo, with neither the States, nor the courts, nor Congress able or willing to exercise control to weed out constitutionally deficient *candidates* until *after* the election occurs. That is the sort of electoral "chaos" that the Supreme Court has repeatedly held States are constitutionally empowered to mitigate. *Storer*, 415 U.S. at 730.

RICHARDSON, Circuit Judge, concurring in the judgment:

Like the majority, I agree that the district court erred. But in my view, the error was not in the court's resolution of the merits of the injunction, but with its jurisdiction to proceed on the statutory claim at all. In its order, the district court purported to determine the meaning of the 1872 Amnesty Act, ch. 193, 17 Stat. 142, as applied to Representative Madison Cawthorn. That order judged Representative Cawthorn's qualifications for office. But under Article I, section 5, clause 1 of the Constitution, the House "shall be the Judge of the Elections, Returns and Qualifications of its own Members." The House of Representatives here is not just *a* judge, it "is *the sole* judge of the qualifications of its members." *Jones v. Montague*, 194 U.S. 147, 153 (1904) (emphasis added). So the district court did not have jurisdiction to consider Representative Cawthorn's claim under the 1872 Amnesty Act, which ultimately asked the court to determine his qualifications, a privilege and duty given only to the House itself.

To reach that conclusion, I work through four premises. I start by explaining that Art. I, § 5, cl. 1 of the Constitution is a jurisdictional bar on a federal court's power to determine the qualifications of a member of Congress. Then I explain how, under Supreme Court precedent, there is no meaningful distinction between judging a member's qualifications and pre-judging a candidate's qualifications. Next, I show why Section 3 of the Fourteenth Amendment is one of the "Qualifications" of membership in the House of Representatives, under the meaning of Art. I, § 5, cl. 1. Those premises together show that courts have no jurisdiction to "judge" a candidate's qualifications under § 3. From there, I conclude by showing why the district court's interpretation of the 1872 Amnesty Act as

applied to Representative Cawthorn amounts to a judging of his § 3 qualification.  Taken together, these premises prove that the district court had no jurisdiction to proceed on Representative Cawthorn's claim under the 1872 Amnesty Act.  While I respect the district court's hesitation to decide core constitutional questions and rely on a statutory ground, that choice was unavailable because the Constitution leaves this question—how the 1872 Amnesty Act applies to Representative Cawthorn's qualifications for office—to the House of Representatives alone.[1]

## I.    Article I, § 5, cl. 1 is a jurisdictional restriction

Courts have an independent responsibility to determine whether they have subject-matter jurisdiction.  *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 501 (2006).  So while the parties have not raised whether the district court had subject-matter jurisdiction over the 1872 Amnesty Act claim, we must ourselves make that determination.  And I believe that the district court lacked such jurisdiction.  I start here by explaining why Art. I, § 5, cl. 1 of the Constitution inhibits federal-court jurisdiction in general and then move on to whether this case and its issues fall into that bar.

Jurisdiction is a court's "statutory or constitutional *power* to adjudicate the case." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998).  The outlines of jurisdiction

---

[1] I do not object to the majority's decision to remand to the district court.  The lower court has not resolved the First and Fourteenth Amendment claims, nor has it resolved the claim that North Carolina's review of federal congressional candidates violates Art. I, § 5, cl. 1.  I recognize the implications of my arguments for Representative Cawthorn's claim under Art. I, § 5, cl. 1.  But that claim is not yet before us.  So implications aside, the district court should have a chance to answer all remaining questions—including any effect the primary results might have on this case—in the first instance.

determine the subject matter of cases and the classes of litigants that a court can entertain. *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 160–61 (2010). By making each House of Congress "*the* Judge" of the qualifications of its own members, the Constitution divests federal courts of any power to determine congressional qualifications, displacing a federal court's default power over federal questions. That conclusion can be reached in two ways: either by treating this as a so-called political question or by applying more mundane principles of interpretation.

First, the political-question doctrine. Like other justiciability doctrines, the political-question doctrine sometimes takes on different forms. One, which could be called the prudential-political-question doctrine, is something like an abstention doctrine. Under that form, courts avoid deciding issues with significant political implications. But the issue here is something different. It is a jurisdictional form of the political-question doctrine. It does not implicate the prudence of our deciding a case, but our very power to do so.[2]

---

[2] In *Baker v. Carr*, 369 U.S. 186, 217 (1962), the Court laid out a list of six ways in which the political-question doctrine might arise. I focus here on the first way, the "textually demonstrable commitment" of the issue to another branch, because it is the most relevant here, is the most important, and is the least controverted. *See Vieth v. Jubelirer*, 541 U.S. 267, 278 (2004) (plurality).

With *Baker* in mind, one more clarification is helpful. As I just suggested, the political-question doctrine is sometimes thought of as a prudential or a quasi-prudential doctrine. But that view of the doctrine has largely been advocated in concurrences and dissents, at least since *Baker*. *See Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 212 (2012) (Breyer, J., dissenting); *Nixon v. United States*, 506 U.S. 224, 253 (1993) (Souter, J., concurring); *Goldwater v. Carter*, 444 U.S. 996, 1000 (1979) (Powell, J., concurring). In other words, the prudential version of the doctrine is a perennial loser. It is true that in *Baker*'s six-factor formulation of the political-question doctrine the last four factors are at least partly prudential. *See* 369 U.S. at 217 (looking to things like policy determination, respect, and embarrassment). But in the years since *Baker*, the Supreme (continued)

While it is, of course, the role of courts to say what the law is, sometimes "the law is that the judicial department has no business entertaining the claim . . . because the question is entrusted to one of the political branches." *Vieth v. Jubelirer*, 541 U.S. 267, 277 (2004) (plurality). That is, in essence, the version of the political-question doctrine at issue here. This doctrine is a "narrow exception" to the general rule that courts should decide cases properly before them. *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 195 (2012). While narrow, it is an exception with a proud history. In *Marbury v. Madison*, Chief Justice Marshall evoked the doctrine, asking whether the delivery or withholding of a commission was "a mere political act, belonging to the executive department alone, for the performance of which, entire confidence is placed by our constitution in the supreme executive; and for any misconduct respecting which, the injured individual has no remedy." 5 U.S. (Cranch) 137, 164 (1803).

Under this version of the political-question doctrine, a court lacks jurisdiction over an issue when there is "a textually demonstrable commitment of the issue to a coordinate political department." *Nixon v. United States,* 506 U.S. 224, 228 (1993) (quoting *Baker v.*

---

Court has summarized the doctrine without a reference to those prudential factors at all. *See, e.g.*, *Zivotofsky*, 566 U.S. at 195 (mentioning only "textually demonstrable commitments" of issues and "a lack of judicially discoverable and manageable standards"); *cf. Powell v. McCormack*, 395 U.S. 486, 518–48 (1969) (spending 30 pages on the "textually demonstrable commitment" factor and two paragraphs on the other political question factors). It is possible any prudential application of the doctrine is dead letter. But however much of the prudential aspect of the political-question doctrine has survived, I refer here only to the firm, Article-III heart of that doctrine that deals with core questions of justiciability and the courts' very competence to hear and decide issues. *See Powell*, 395 U.S. at 518 (grounding the doctrine in separation of powers concerns); *see also Rucho v. Common Cause*, 139 S. Ct. 2484, 2494 (2019).

*Carr*, 369 U.S. 186, 217 (1962)).  In layman's terms, the political-question doctrine says that when the Constitution gives exclusive power over an issue to another branch of government, courts are deprived of their jurisdiction to decide that issue.  To figure out whether a power is textually committed to another branch of the government, "we must interpret the Constitution," *Powell v. McCormack*, 395 U.S. 486, 519 (1969), and determine whether the issue is exclusively given to another branch of the American government.[3]

---

[3] The Supreme Court has strongly hinted that the actual judging of qualifications is a political question.  Take *Barry v. United States ex rel. Cunningham*, 279 U.S. 597, 613, 616 (1929).  In that case, the Supreme Court described each House's Art. I, § 5, cl. 1 power as "judicial in character," including the power to "render a judgment which is beyond the authority of any other tribunal to review."  This is a strong hint that Congress's power displaces our own power as federal courts.  Add this to the voluminous Supreme Court dicta suggesting the Houses are the exclusive judges and my conclusion seems even more in line with the thrust of the Court's precedent.  *See, e.g.*, *Powell*, 395 U.S. at 548 ("[W]e have concluded that Art. I, § 5, is at most a 'textually demonstrable commitment' to Congress to judge only the qualifications expressly set forth in the Constitution."); *see also U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 804 (1995) ("The text of the Constitution thus gives the representatives of all the people the final say in judging the qualifications of the representatives of any one State."); *id.* at 811 ("Art. I, § 5, vests a federal tribunal with ultimate authority to judge a Member's qualifications . . . ."); *Jones*, 194 U.S. at 153 (The House of Representatives "is the sole judge of the qualifications of its members."); *Barry*, 279 U.S. at 619 ("The Senate, having sole authority under the Constitution to judge of the elections, returns and qualifications of its members" exercises "the full, original, and unqualified power by the Constitution."); *Reed v. Cnty. Comm'rs*, 277 U.S. 376, 388 (1928) (noting that the Senate "is the judge of the elections, returns, and qualifications of its members" and is "fully empowered"); *Powell*, 395 U.S. at 552 (Douglas, J., concurring) ("Contests may arise over whether an elected official meets the 'qualifications' of the Constitution, in which event the House is the sole judge."); *Baker*, 369 U.S. at 242 n.2 (Douglas, J., concurring) ("Of course each House of Congress, not the Court, is 'the judge of the elections, returns, and qualifications of its own members.'").  We have sometimes suggested that we are bound by on-point Supreme Court dicta.  *See Yanez-Marquez v. Lynch*, 789 F.3d 434, 450 (4th Cir. 2015).  But whether these statements are binding will not matter to my analysis.  I proceed with the question from first principles and reach the same conclusion as these cases.

Start with an easy example of a textually demonstrable commitment:  The Constitution says that "the Senate shall have the sole Power to try all Impeachments."  Art. I, § 3, cl. 6.  That commitment is clear as a bell.  This "textually demonstrable commitment" to the Senate deprives federal courts of jurisdiction.  *See Nixon*, 506 U.S. at 228–29.  Federal courts have no power to try impeachments.  I believe the same is true of Art. I, § 5, cl. 1, which says that "each House shall be the Judge of the Elections, Returns, and Qualifications of its own Members."[4]

In my view, Art. I, § 5, cl. 1 is one of the rare instances, like the Impeachment Clause, where the Constitution really does say, in black and white, that an issue is reserved for another branch and that branch alone.  In the words of then-Judge Scalia, "[i]t is difficult to imagine a clearer case of 'textually demonstrable constitutional commitment' of an issue

---

[4] Maybe the Impeachment Clause is different because it uses the word "sole" while Art. I, § 5, cl. 1 does not.  *See Nixon*, 506 U.S. at 229 ("[T]he word 'sole' indicates that this authority is reposed in the Senate and nowhere else.").  But I don't believe so.  The phrase "sole Power" is used twice in the Constitution, at Art. I, § 2, cl. 5 and at Art. I, § 3, cl. 6.  The first time, the Constitution explains that the House of Representatives shall have "the sole Power of Impeachment."  Art. I, § 2, cl.5.  The second time, the Constitution explains that the Senate shall have "the sole Power to try all Impeachments."  Art. I, § 3, cl. 6.  This mirroring makes sense:  One House of Congress is given the full power to start impeachment proceedings, and the other House is given the full power to finish them.  The word "sole" makes that division of labor clear.  On the other hand, the clause we focus on says "each House shall be the Judge of the Elections, Returns and Qualifications."  Art. I, § 5, cl. 1.  This reference has no partner; it stands alone.  It simply states who "*the* Judge" will be.  The article "the" meant at the Founding what it means now:  "the article noting a particular thing."  Samuel Johnson, *A Dictionary of the English Language* (3d ed. 1768).  So saying "*the* Judge" in this clause means "the particular Judge," in other words, the only judge.  That exclusivity is clear enough without the word "sole."  And if that were unclear, the Supreme Court has repeatedly stated Congress is the "sole judge" of such qualifications.  *See Thornton*, 514 U.S. at 816 (quoting 17 Annals of Congress 871 (1807)); *Jones*, 194 U.S. at 153.

45

to another branch of government to the exclusion of the courts than the language of Article I, section 5, clause 1 that 'each House shall be the Judge of the Elections, Returns and Qualifications of its own Members.'" *Morgan v. United States*, 801 F.2d 445, 447 (D.C. Cir. 1986); *see also Nixon*, 506 U.S. at 240 (White, J., concurring) (suggesting that this is the clearest example of such a textually demonstrable commitment). By committing the power to judge qualifications of members to each House of Congress, the Constitution thereby takes away our power as federal judges to judge a member's qualification. In other words, we lack jurisdiction.

My interpretation of Art. I, § 5, cl. 1 as jurisdictional is fully in line with the Founding-era understanding of legislative independence. "Each house is made the *sole* judge of the election, return, and qualifications of its members. The same power is vested in the British house of commons, and in the legislatures of the several states; and there is no other body known to the constitution to which such a power might safely be trusted." 1 James Kent, *Commentaries on American Law* 220 (1826) (emphasis added); *see also* William Rawle, *A View of the Constitution of the United States of America* 42 (1825) ("Both the senate and house of representatives possess the *usual powers* to judge of the elections, returns and qualifications of their own members." (emphasis added)). So commonplace was the idea that a legislature should police its own returns and qualifications that there was little debate over the fact that each House was made the judge of its own issues. *See* Charles Warren, *The Making of the Constitution* 419 (2d ed. 1937) (describing the addition of the clause, with only questions about what qualifications would

be included and nothing about the sole power of judging them).[5]   As then-Judge Scalia

summarized his survey of the early history, "[i]n almost two centuries of numerous election

contests resolved by the House and Senate, beginning in the very first Congress, no court,

_____

[5] In prescribing only those few, necessary qualifications, the Constitution otherwise guaranteed "the natural right of all men to chose whom they please . . . to represent and advocate their interests."  17 Annals of Congress 873 (1807) (Rep. William Findley).  As James Madison explained:

> The qualifications of the elected being less carefully and properly defined by the State Constitutions, and being at the same time more susceptible of uniformity, have been very properly considered and regulated by the Convention.  A representative of the United States must be of the age of twenty-five years; must have been seven years a citizen of the United States, must at the time of his election, be an inhabitant of the State he is to represent, and during the time of his service must be in no office under the United States.  Under these reasonable limitations, the door of this part of the Federal Government, is open to merit of every description, whether native or adoptive, whether young or old, and without regard to poverty or wealth, or to any particular profession of religious faith.

The Federalist No. 52 (James Madison); *see also* The Federalist No. 57 (James Madison) ("The electors are to be the great body of the people of the United States.  They are to be the same who exercise the right in every State of electing the corresponding branch of the legislature of the State.  Who are to be the objects of popular choice?  Every citizen whose merit may recommend him to the esteem and confidence of his country."); The Federalist No. 60 (Alexander Hamilton) ("The truth is, that there is no method of securing to the rich the preference apprehended, but by prescribing qualifications of property either for those who may elect or be elected.  But this forms no part of the power to be conferred upon the national government. Its authority would be expressly restricted to the regulation of the times, the places, and the manner of elections.  The qualifications of the persons who may choose or be chosen, as has been remarked upon other occasions, are defined and fixed in the Constitution, and are unalterable by the legislature."); 4 *The Complete Anti-Federalist* 184–85 (A Republican Federalist, no. 6) (Feb. 2, 1788) (Storing, Herbert J. ed., 1981) (expressing concern that the limited qualifications would permit foreigners to be elected).

as far as we are aware, has ever undertaken to review the legislative judgment or (until the present litigation) even been asked to do so."  *Morgan*, 801 F.2d at 447–48.[6]

As James Madison wrote, "Each house is, *as it necessarily must be*, the judge of the elections, qualifications, and returns of its members."  The Federalist No. 53 (emphasis added); *see also* 4 *The Complete Anti-Federalist* 142 (Cornelius) (Dec. 18, 1787) ("By this Federal Constitution, each House is to be the judge, not only of the elections, and returns, but also of the qualifications of its members; and that, without any other rule than such as they themselves may prescribe.").  Article I, § 5, cl. 1 grants each House the exclusive power to judge its members and their elections to ensure that Congress is not beholden to the states, the executive, or the courts.  As Justice Joseph Story explains in volume II of *Commentaries on the Constitution of the United States*:

> It is obvious, that a power must be lodged somewhere to judge of the elections, returns, and qualifications of the members of each house composing the legislature; for otherwise there could be no certainty, as to who were legitimately chosen members, and any intruder, or usurper, might claim a seat, and thus trample upon the rights, and privileges, and liberties of the people.  Indeed, elections would become, under such circumstances, a mere mockery; and legislation the exercise of sovereignty by any self-constituted body.  The only possible question on such a subject is, as to the body, in which such a power shall be lodged.  If lodged in any other, than the legislative body itself, its independence, its purity, and even its existence and action may be destroyed, or put into imminent danger.  No other body, but itself, can have the same motives to preserve and perpetuate these attributes; no other body can be so perpetually watchful to guard its own rights and privileges from infringement, to purify and vindicate its own character, and to preserve the rights, and sustain the free choice of its constituents.  Accordingly, the power has always been lodged in the legislative body by the uniform practice of England and America.

---

[6] For the early history, see generally M. St. Clair Clarke & David Hall, *Cases of Contested Elections in Congress, From the Year 1789 to 1834, Inclusive* (1834).

§ 831 (1833). These core separation-of-powers concerns only bolster my understanding that Art. I, § 5, cl. 1 takes away the courts' jurisdiction.[7]

Rather than view this question through the political-question doctrine, we might instead just reach for familiar principles of interpretation to determine whether the Art. I, § 5, cl. 1 acts as a bar to our jurisdiction. In the statutory context, we look to whether a requirement speaks clearly and in "jurisdictional terms." *See Arbaugh*, 546 U.S. at 515. If there is clear indication that some language goes to a court's jurisdiction—i.e., their very power to adjudicate—then the bar is jurisdictional. And again, I agree with then-Judge Scalia that it is hard to imagine a clearer bar on our jurisdiction that doesn't out-and-out say, "no jurisdiction here." *Morgan*, 801 F.2d at 447. Article I, § 5, cl. 1 says that each House "shall be *the* judge" of the qualifications of members. Art. I, § 5, cl. 1 (emphasis added). "The exclusion of others—and in particular of others who are judges—could not be more evident." *Morgan*, 801 F.2d at 447; *see also McIntyre v. Fallahay*, 766 F.2d 1078, 1081 (7th Cir. 1985) (Easterbrook, J.) ("The House is not only 'Judge' but also final

---

[7] "In keeping with the fundamental principle prohibiting judicial encroachment upon the functions of the legislature, judicial usurpation of legislative power, and judicial interference with the exercise of legislative power, it is well settled that such a constitutional provision [i.e., Art. I, § 5, cl. 1] vests in the legislature the sole and exclusive power to judge the election and qualifications of its own members and deprives the courts of jurisdiction to determine these matters." Note, *The Legislature's Power To Judge the Qualifications of Its Members*, 19 Vand. L. Rev. 1410, 1410 (1966); *see also* Paul E. Salamanca & James E. Keller, *The Legislative Privilege to Judge the Qualifications, Elections, and Returns of Members*, 95 Ky. L.J. 241, 254–76 (2006–2007) (tracing the legislative prerogative in seating members from 16th-century England to the American colonies and state constitutions).

arbiter.").  Article I, § 5, cl. 1 uses clear language and speaks in jurisdictional terms, so its bar on our power is jurisdictional.

The challengers have raised a pragmatic argument against the House's sole power to judge its members' qualifications.  The argument is best summarized with a borrowed hypothetical:  "What of the 'obviously' unqualified candidate?  What if someone sought to put a pet dog on the ballot—or a corporation?"  Derek T. Muller, *Scrutinizing Federal Electoral Qualifications*, 90 Ind. L.J. 559, 598 (2015).  The challengers argue that it makes no sense to leave this question to Congress because that would lead to chaos.  I doubt their prediction.  North Carolina, for instance, has measures in place that prohibit unaffiliated candidates from getting on the ballot without a petition bearing signatures representing 1.5% of the registered voters in the state.  *See* N.C. Gen. Stat. § 163-122(a); *see also Buscemi v. Bell*, 964 F.3d 252, 257 (4th Cir. 2020) ("An unaffiliated candidate in a districtwide election, including an election for the United States House of Representatives, must collect the signatures of at least 1.5% 'of the total number of registered voters in the district.'" (citing § 163-122(a)(2)).  That example shows why the sky-is-falling argument is unpersuasive here, but it also exemplifies the states' proper role in federal elections.  Laws that require an initial showing to weed out frivolous or unsupported candidates are laws that properly deal with the "Manner" of elections—with procedure and not substance.  *See Storer v. Brown*, 415 U.S. 724, 733 (1974).  That would be a way to ensure that elections were limited to "major struggles," *id.* at 735, without allowing a state or the courts to unjustifiably judge the substance of a candidacy.

Either through the political-question doctrine or as a simple matter of reading the text of the Constitution, a court lacks jurisdiction to judge the qualifications of a member of Congress. *See Sevilla v. Elizalde*, 112 F.2d 29, 38 (D.C. Cir. 1940) ("We are cited to no cases, and we find none, in which the Federal courts have even been asked to determine the qualifications of a member of Congress."). Article I, § 5, cl. 1 of the Constitution is a jurisdictional bar on a federal court's power.[8]

Now I must move on to whether this case and its issues are covered by that bar.[9] If § 3 of the Fourteenth Amendment is not a "Qualification," then any jurisdictional limitation in Article I would not have barred the district court from answering whether the 1872 Amnesty Act prospectively lifted a disqualification from office. But first, I address whether Art. I, § 5, cl. 1 covers candidates to office as well as "Members" of Congress.

---

[8] The challengers have pointed to a similar case ongoing in Georgia that came out their way. *Greene v. Raffensperger*, No. 22-cv-1294, 2022 WL 1136729, at *26–28 (N.D. Ga. Apr. 18, 2022). There the Northern District of Georgia held that "states have the power to exclude from the ballot constitutionally unqualified or ineligible candidates." *Id.* at *26. In essence, the court found that this is not an issue left only for the House. Citing cases from the Ninth and Tenth Circuit, the court found that states can keep unqualified candidates off the ballot, for instance a "twenty-seven-year-old who was constitutionally ineligible to become president because of her age." *Id.* (citing *Lindsay v. Bowen*, 750 F.3d 1061, 1064 (9th Cir. 2014) and *Hassan v. Colorado*, 495 F. App'x 947, 948 (10th Cir. 2012) (Gorsuch, J.) (unpublished)). But respectfully, *Greene* misses the mark. The two cases it cites dealt with presidential qualifications. The Constitution does not have an analogous clause that submits exclusive jurisdiction over *presidential* qualifications to any branch. So those cases are simply not relevant.

[9] Under *Powell*, courts may determine "the existence and scope of the textual commitment to the House to judge the qualifications of members," 395 U.S. at 519 n.40, without intruding on Congress's sole authority to judge those qualifications. We may determine the meaning of the Constitution—e.g., what counts as a qualification and who may judge them—without having anything to say about who fits or does not fit those qualifications.

## II.    Article I, § 5, cl. 1 covers candidates as well as "Members"

The district court purported to determine how the 1872 Amnesty Act applied to Representative Cawthorn's qualifications for office *in his capacity as a candidate*. But Art. I, § 5, cl. 1 speaks of "Members." If there were a meaningful difference between candidates and "Members" on this point, any jurisdictional bar in Art. I, § 5, cl. 1 would not apply here. But the Supreme Court has twice refused to draw that line between candidates and "Members." In *U.S. Term Limits v. Thornton*, 514 U.S. 779 (1995) and in *Cook v. Gralike*, 531 U.S. 510 (2001), the Supreme Court struck down attempts by states to substantively affect election outcomes by leveraging power over candidates' ballot access. These cases show that Art. I, § 5, cl. 1 forbids judging the qualifications of candidates for congressional office, just the same as it forbids the judging of "Members."

Start with *Thornton*. There, the Supreme Court struck down a term limit for getting on the ballot in Arkansas, and throughout the opinion the Court described the law as a requirement for "candidates" and "ballot access" but found that Art. I, § 5, cl. 1 applied all the same. *See* 514 U.S. at 782, 788. The provision at issue said that anyone beyond the term limit "shall not be certified as a candidate and shall not be eligible to have his/her name placed on the ballot for election to the United States Senate from Arkansas." *Id.* at 784. Arkansas argued that this was not about qualifications for membership but really a permissible Times, Places, and Manner regulation under Art. I, § 4, cl. 1. *Id.* at 828. It insisted that this provision was only about ballot access and that incumbents could still win through write-in campaigns; therefore, the provision did not fall into Art. I, § 5, cl. 1's "absolute bar." The Court rejected that argument: "In our view, Amendment 73 is an

52

indirect attempt to accomplish what the Constitution prohibits Arkansas from accomplishing directly." *Id.* at 829. "Allowing States to evade the Qualification Clauses by dressing eligibility to stand for Congress in ballot access clothing trivializes the basic principles of our democracy that underlie those Clauses." *Id.* at 831 (cleaned up). Those same principles apply here. An attempt to pre-judge the qualifications of a candidate to get on the ballot is just dressing up a judging of congressional membership qualifications in "ballot access clothing." Candidates are, after all, really only prospective Members; that's the whole idea.

The Supreme Court in *Cook* repeats the same principle, only louder. *Cook* dealt with a state rule that asked candidates to pledge to work tirelessly for a federal constitutional amendment to create congressional term limits and, if they refused, the ballot would list in big, bold letters next to their name "DISREGARDED VOTERS' INSTRUCTION ON TERM LIMITS." 531 U.S. at 514. The Court found even this to be an attempt to substantively affect the election, which tried to add a kind of a qualification, and which was more than procedural. Even where the states only tried to tinker with the white space around a candidate's name on the ballot, such a rule was enough to offend Art. I, § 5, cl. 1 because it tried to affect the substance of the election. *Id.* at 525–26. States cannot "attempt to dictate electoral outcomes" by leveraging their procedural power over

the ballot. *Id.* (cleaned up). Similarly, states cannot "attempt to dictate electoral outcomes" by pre-judging a candidate's qualifications for office.[10]

The thrust of *Cook* and *Thornton* is that any attempt to regulate candidates or ballot access for federal office is an implicit attempt to regulate the qualifications of members of Congress, which is not allowed. And judging the qualifications of candidates is substantive. Although neither *Thornton* nor *Cook* deals directly with the "judging" of qualifications, this case is naturally covered by their principles. Just like the states in *Thornton* and *Cook* could not intrude on the respective Houses' prerogative to judge their own members' qualifications by regulating candidates or ballot access, a federal court cannot intrude on the House of Representatives' prerogative to judge its own members just because the specific question at hand deals with ballot access for a candidate.

Because only Congress—not the states, and not the courts—may judge the qualifications of members or would-be members, the next issue is whether § 3 of the Fourteenth Amendment is a "Qualification" under Art. I, § 5, cl. 1.

---

[10] When taking a broader historical perspective, it makes sense that the Court found that ballot access cannot be meaningfully distinguished from attempts to add qualifications. Ballots were not used in the United States until the late 19th century, about 20 years after the Fourteenth Amendment was ratified. *See* Derek T. Muller, *Ballot Speech*, 58 Ariz. L. Rev. 693, 697 (2016). For the first century of our country, the States had no means to nudge the vote in this way. So it makes sense that the Court was skeptical of any use of that innovation to justify a state's unprecedented power to shape the electorate's actual choices about who to vote for. Because the ballot, like the primary, has been "made an integral part of the election machinery," it is subject to the Constitution's laws about elections. *See United States v. Classic*, 313 U.S. 299, 318 (1941).

III.    **Section Three of the Fourteenth Amendment is a "Qualification"**

Section 3 of the Fourteenth Amendment is a constitutional qualification for membership in the House of Representatives as revealed by the text, structure, and history of that section.  Although the Supreme Court has suggested that § 3 may be a qualification, it has not outright said so.  Consequently, this is a matter of first impression.

To start, the qualifications for each House of Congress are "fixed and exclusive" and must be based in the text of the Constitution.  *Thornton*, 514 U.S. at 790.  So as an initial matter, it is important that qualifications be found in the text of the Constitution itself, which § 3 of course is.  While the Supreme Court is clear that qualifications must be found in the constitutional text, the Court has not provided a full catalogue of the constitutional provisions that count.  Neither is there a self-identifying list of qualifications in the Constitution.  Instead, one must comb through the Constitution.  While it is natural to think of the canonical trio of age, citizenship, and residency as the whole story, *see* Art. I, § 2, cl. 2 (House of Representatives); Art. I, § 3, cl. 3 (Senate), those aren't the only qualifications in the Constitution.

Take the most obvious example:  Article I, § 3, cl. 7 says that "Judgment in Cases of Impeachment shall not extend further than to removal from Office, and *disqualification* to hold and enjoy any Office of honor, Trust or Profit under the United States . . . ." (emphasis added).[11]  That requirement naturally falls into the "Qualifications" category of

---

[11] To be clear, it appears accepted that Members of Congress are not civil officers subject to impeachment.  *See* David P. Currie, *Constitution in Congress: The Federalist Period: 1789–1801*, at 275–281 (1997) (noting that the impeachment proceedings of (continued)

Art. I, § 5, cl. 1; it even uses the word disqualification.[12]  And that is not the only other provision that reads like a qualification.  Other possibilities include:  a prohibition on concurrent officeholding, Art. I, § 6 cl. 2 ("No Senator or Representative shall, during the Time for which he was elected, be appointed to any civil Office under the Authority of the United States . . . ."); an oath-taking requirement, Art. VI, cl. 3 ("The Senators and Representatives . . . shall be bound by Oath or Affirmation, to support this Constitution."); and possibly even the Guaranty Clause, which might require that Senators or Representatives be elected by states with a "Republican Form of Government," Art. IV, § 4.  Each of these has been at least contemplated by the Supreme Court.  *See Thornton*, 514 U.S. at 787 n.2; *Powell*, 395 U.S. at 521 n.41.[13]

---

Senator Blount in 1797–98 is commonly cited as having established that members of Congress are not "officers of the United States" for impeachment under Art. II, § 4).  Even so, it appears that an officer who is impeached from some other office—say a federal judgeship—may be disqualified from becoming a member of Congress later.  *Compare* Art. II, § 4 (discussing "[t]he President, Vice President and all civil Officers"), *with* Art. I, § 3, cl. 7 (explaining how punishment for impeachment can include disqualification from "any Office of honor, Trust or Profit under the United States").

[12]  I see no reason to distinguish between qualifications and disqualifications, especially since the canonical trio are also stated in the negative as well.  *See, e.g.*, Art. I, § 2, cl. 2 ("No person shall be a Representative who shall not have attained to the Age of twenty five Years . . . .").  The *Powell* court agrees with my basic assessment that positive or negative phrasing should not resolve the status of a qualification.  *See* 395 U.S. at 539 n.73.  And as I explain below, I think that the repeated negative phrasing in the Constitution is a sign that the drafters of § 3 were trying to mimic the qualifications in Art. I, §§ 2, 3.  That phrasing may illuminate the meaning of the words, even if it isn't necessary to create a qualification.

[13]  While it may seem strange at first to see qualifications spread throughout the Constitution instead of grouped together, one explanation is that there are diverging qualifications for different offices, which are sometimes but only sometimes overlapping.  The House of Representatives has a list unique to it, Art. I, § 2, cl. 2, just as the Senate does, Art. I, § 3, cl. 3.  The impeachment disqualification applies not just to Congress but (continued)

That brings us back to § 3 of the Fourteenth Amendment.  Its status as a qualification is also an open question, as it has been mentioned by the Supreme Court as a possible qualification, but the Court has never decided for sure.  *See Thornton*, 514 U.S. at 787 n.2; *Powell*, 395 U.S. at 521 n.41.[14]  The Supreme Court's suggestion, in both *Thornton* and *Powell*, that § 3 is a strong candidate for being a qualification gives some support to my conclusion here.  But for all this discussion, neither precedent nor explicit text has ultimately decided whether § 3 is a "Qualification."  So 153 years after the ratification of the Fourteenth Amendment, I must turn to text, structure, and history.

The first thing to notice is the phrasing of the commonly-agreed-upon qualifications.  "No Person shall be a Representative who shall not . . ." is how Art. I, § 2, cl. 2 starts the list of qualifications for the House, including age, citizenship, and residency; Art. I, § 3, cl. 3—the one about Senators—starts the same way, "No person shall be a Senator who shall not . . . ."  And § 3 of the Fourteenth Amendment uses the very same introduction: "No person shall be a Senator or a Representative in Congress . . . who . . . ."  This phrasing reads like intentional repetition.  And the same language should suggest the same meaning.  If age and citizenship are qualifications, and if § 3 is phrased just like the age and citizenship qualifications, that is strong evidence that § 3 is itself a qualification.

---

to "any Office of honor, Trust or Profit," Art. I, § 3, cl. 7, so it is naturally set off.  The Fourteenth Amendment was added later, so it too is set off.  Taking the wide view, there is little surprise that the qualifications are spread throughout the document.

[14] *Powell* does at one point refer to "the three standing qualifications set forth in the Constitution."  395 U.S. at 520.  But that phrase is in the sentence which ends in a footnote where the Court then raises and reserves whether § 3 of the Fourteenth Amendment is a qualification under Art. I, § 5, cl. 1.  *Id.* at 520 n.41.  So in context, that phrase does not foreclose § 3 from being a qualification.

There is also reason to believe that this negative formulation was an important signal. The first draft of Art. I, § 2, cl. 2 at the Constitutional Convention reads: "Every member of the House of Representatives shall be of the age of twenty five years at least; shall have been a citizen of (in) the United States for at least three years before his election; and shall be, at the time of his election, a resident of the State in which he shall be chosen." *Powell*, 395 U.S. at 537. This is a list of positive qualifications, not disqualifications. But then the Committee of Style flipped that language to the "No person shall" formulation that was ultimately adopted. *Id.* The earlier English practice, recounted in Blackstone, was to describe parliamentary qualifications in the negative, as "standing incapacities" on the ability to serve in Parliament. *Id.* at 537–38 (citing 1 W. Blackstone, *Commentaries* *175–76). That the drafters at the Founding and the drafters of the Fourteenth Amendment both used a deliberate negative formulation of the qualifications, which mimicked an earlier English practice, is even more evidence that § 3 was meant as a qualification.[15]

Beyond the repetition of phrasing, the very meaning of the word "qualification" supports my understanding. Founding-era dictionaries suggest that "qualification" means then what it did during the passage of the Fourteenth Amendment and what it does now—

---

[15] The *Powell* Court rejected an argument along these lines, but for different reasons. In *Powell*, the Court rejected the idea that the link to Blackstone somehow incorporated Blackstone's other arguments about the inherent legislative ability to exclude members for general unfitness. 395 U.S. at 538. The *Powell* Court rightly held that the change from the positive to negative phrasing was done by the Committee of Style, who lacked the authority to change the substance of the Constitution. *Id.* at 538–39. I am not arguing that this negative phrasing is necessary or sufficient to making a constitutional qualification. My point is much less grandiose. I only suggest that the negative phrasing, used in Blackstone, used by the Committee of Style, and then copied verbatim by § 3, is a sign that those clauses should be read together. The same words should evoke the same meaning.

"that which makes any person or thing fit for any thing." Samuel Johnson, *A Dictionary of the English Language* (3d ed. 1768); *see also* Thomas Dyche & William Pardon, *A New General English Dictionary* (13th ed. 1768) ("something that enables or empowers a person to do that which otherwise he could not"); Joseph E. Worcester, *Dictionary of the English Language* (1860) ("That which qualifies or fits any person or thing for any use or purpose, as an office . . ."); *Black's Law Dictionary* (8th ed. 2004) ("the possession of qualities or properties . . . inherently or legally necessary to make one eligible for a position or office . . ."). The qualifications for membership to the House of Representatives, then, are all those things in the text of the Constitution, *Thornton,* 514 U.S. at 790, that make a person fit or unfit for the office. Qualifications are all those boxes that must be checked before a member may take office, and § 3 of Fourteenth Amendment naturally reads as box to be checked before a member may take office. "No person shall be a Senator or Representative in Congress . . . who, having previously taken an oath, as a member of Congress . . . shall have engaged in insurrection or rebellion . . . ." U.S. Const. amend. XIV, § 3. The section is naturally read as a thing that makes someone fit or unfit for office, so it falls within the natural meaning of "qualification." Between the natural meaning of "qualification" and the repetition of the phrasing of the canonical qualifications, the text and structure of the Constitution make clear that § 3 of the Fourteenth Amendment is a "Qualification" under the meaning of Art. I, § 5, cl. 1.

Now from the text and structure to the historical backdrop.  Because no cases

expound on § 3, we must look elsewhere to understand it.[16]  There is a reasonable amount

---

[16] There are two cases from the 19th century that might, at first blush, illuminate the meaning and application of § 3, but in the end, they are too confused and confusing to help much.  Both cases were presided over by Chief Justice of the United States Salmon P. Chase, but only while he was riding circuit in Virginia.  *See* Gerard N. Magliocca, *Amnesty and Section Three of the Fourteenth Amendment*, 36 Const. Comm. 87, 100–08 (2021).  The first case was the treason trial of Jefferson Davis.  Davis's defense team made the astonishing argument that, because § 3 of the Fourteenth Amendment was a punishment and not a qualification, he could not be convicted for treason under the Fifth Amendment's prohibition on double jeopardy.  Dwight J. Davis, *The Legal Travails of Jefferson Davis*, 23 J.S. Legal Hist. 27, 73 (2015).  Strangely, it was Chief Justice Chase himself who suggested the idea to Davis's defense team, as it would allow a procedural ruling that might "save Chase from making a decision on the question of whether or not secession is treason." C. Ellen Connally, *The Use of the Fourteenth Amendment by Salmon P. Chase in the Trial of Jefferson Davis*, 42 Akron L. Rev. 1165, 1196 (2009).  While Andrew Johnson's pardon of Davis eventually mooted the case, Chief Justice Chase went on the record anyway.  He agreed with the defendant's argument that § 3 was a punishment and that "it executes itself."  *In re Davis*, 7 F. Cas. 63, 90 (C.C.D. Va. 1871).  "THE CHIEF JUSTICE instructed the reporter to record him as having been of opinion on the disagreement, that the indictment should be quashed, and all further proceedings barred by the effect of the fourteenth amendment to the constitution of the United States."  *Id.* at 102.

A holding that § 3 was a punishment might cut against my interpretation.  But in another case around the same time Chase found "that the text was not self-executing in Virginia and—in the absence of congressional action—did not apply to a Black criminal defendant there."  Magliocca, *supra*, at 88.  In *In re Griffin*, a Black prisoner sought habeas relief, arguing that his conviction was void because the sitting judge had been an insurrectionist.  Chase again suggested that "exclusion from office [w]as a punishment," *In re Griffin*, 11 F. Cas. 9, 26 (C.C.D. Va. 1869), but this time he found that § 3 was *not* self-executing, a reversal from his opinion in *Davis*.  *Id.* at 26 ("these can only be provided for by congress").

These contradictory holdings, just a few years apart, draw both cases into question and make it hard to trust Chase's interpretation.  It might seem that Chase was motivated by Confederate sympathies or some sort of prejudice, as he twisted § 3 one way to help arch-Confederate Jefferson Davis and then twisted it the other to ratify decisions by a former-Confederate judge.  But that is probably not right.  Chase was appointed by Lincoln and "was one of America's greatest antislavery lawyers, and his record refutes any inference of racial animus."  Magliocca, *supra*, at 106.  A more likely motive was that Chase was against § 3 for pragmatic reasons.  Apparently, Chase had worked vigorously (continued)

of history from congressional practice working through the meaning and application of § 3. That practice reinforces my conclusion that § 3 is a qualification. I admit that the Supreme Court has not always found congressional practice to be authoritative, *see Powell*, 395 U.S. at 546 ("Had these congressional exclusion precedents been more consistent, their precedential value still would be quite limited."), and I too would never use it as more than supporting evidence. But Congress has acted as if § 3 was a qualification for seating members for more than a century, and that is some evidence for my reading. *See* Jack Maskell, Cong. Rsch. Serv., *Qualifications of Members of Congress* 18–20 (2015).

Let's begin with an Act of July 2, 1862, ch. 127, 12 Stat. 502, which attempted by statute to require that "every person elected or appointed to any office . . . under the government of the United States, shall, before entering upon the duties of such office" take an oath that they have never taken up arms against the government. In short, Congress tried to add a qualification through statute, one that looked a lot like what § 3 would become. And there were a few exclusions done in the name of this statute between the end of the Civil War and the passage of the Fourteenth Amendment. *See* Miles S. Lynch, *Disloyalty & Disqualification: Reconstructing Section 3 of the Fourteenth Amendment*, 30

to keep § 3 out of the Fourteenth Amendment, fearing that it "was too harsh on former Confederate officials," making reunification harder. Connally, *supra*, at 1196 (citing John Niven, *Salmon P. Chase: A Biography* 409 (1995)). Whatever Chief Justice Chase's reasons, I do not take either *Davis* or *Griffin* for much useful background about whether § 3 was a qualification. Because he was acting as a circuit judge, his opinions are not binding on us. So these opinions are only useful as persuasive authority or as evidence of contemporary understanding. Between the shifting legal conclusions, Chase's pragmatic political concerns, and the obvious conflicts of interest, I do not take his discussion as much evidence of broader contemporary understanding. As for persuasiveness, it is unclear to me why the disqualification theory and the punishment theory are mutually exclusive.

Wm. & Mary Bill Rts. J. 153, 196–200 (2021).  In early 1868, months before the Fourteenth Amendment was ratified but about two years after it passed Congress, there were expulsions under the statute but debate about whether this was an unconstitutional expansion of the set list of constitutional qualifications.  During debate, some House members argued that "the attempt in the act of July 2, 1862, to impose another qualification was in direct conflict with the terms of the original pact."  1 Hind's *Precedents of the House of Representatives* ch. 14, § 449, at 446 (1907).  On the other side of the argument, there was worried discussion about the effects of a limited list of qualifications—Confederates might have to be seated, after all.  *Id.* at 447.  But in the end, the House excluded some Kentucky rebels under the statute anyway, constitutional worries or not.  Under modern precedent, that exclusion would be unconstitutional, done as it was just before the ratification of the Fourteenth Amendment and under only statutory authority.  Lynch*, supra*, at 198 & n.304 (citing *Powell*, 395 U.S. 486).  But still, this is an example, just a few months before § 3 was ratified by the states, of Congress debating the validity of a statutory disqualification about to become enshrined in the Fourteenth Amendment.  That historical backdrop suggests that § 3 was meant to be treated as a disqualification, enforced by Congress before seating members.[17]

---

[17] Of course, our modern understanding that the constitutional qualifications are fixed in the text of the Constitution was not decided until about 100 years later in *Powell*. In the 19th century, there was debate on the matter, so it would have made practical sense to pass an 1862 statute requiring a no-insurrection qualification and then also try to add that qualification to the constitutional text in the Fourteenth Amendment to make it harder to undo later.

And in the first few years after the Fourteenth Amendment's ratification, both the House of Representatives and the Senate considered excluding elected members using § 3 as the vehicle. In 1869, John M. Rice was challenged as "disloyal" under § 3. 1 Hind's, *supra*, ch. 14, § 460, at 472. Under the customary House practice, Rice was sworn and conditionally seated, while his qualifications were determined. A majority of the House committee that adjudicated his case found the following: "*Resolved*, That the Hon. John M. Rice is disqualified by the third section of the fourteenth amendment to the Constitution of the United States from holding a seat in Congress." *Id.* at 473. A minority of the committee disagreed with that factual finding, and when the full House debated the question, they overruled the majority's factual finding and seated Rice. No matter the outcome, the House was asking whether Rice was disqualified under § 3.

In 1870, another § 3 question arose around Member-elect Lewis McKenzie. *Id.* § 462, at 476. It was alleged that McKenzie "was guilty of acts in the early part of the year 1861 which made him ineligible under the third section of the fourteenth article of amendments to the Constitution." *Id.* Lewis was a member of the Virginia legislature before the war and had generally supported "unit[ing] her destiny with the slaveholding States of the South." Lynch, *supra*, at 207 (quoting 1 Hind's, *supra*, ch. 14, § 462, at 477). But Virginia had not yet entered the war when those comments were made, so the committee ultimately found that McKenzie was not ineligible under § 3. 1 Hind's, *supra*, ch. 14, § 462, at 477–78. Again, the House viewed § 3 as an issue of eligibility for office.

The Senate, on the other hand, did more than consider using § 3: They actually excluded a member-elect based on it. "Zebulon B. Vance was the wartime Governor of

North Carolina" and he was elected to the Senate in 1870. Gerard N. Magliocca, *Amnesty and Section Three of the Fourteenth Amendment*, 36 Const. Comm. 87, 110 (2021). He won the seat from "a former brigadier general in the Union army and steadfast Republican" named Joseph C. Abbott. Anne M. Butler & Wendy Wolff, U.S. Senate Hist. Off., *United States Senate: Election, Expulsion and Censure Cases 1793–1990*, at 166 (1995). Abbott challenged Vance's qualifications under § 3, and he made that challenge in the Senate. Vance had served in Congress before joining in North Carolina's efforts in the Civil War, subjecting him to the disabilities of § 3. *Id.* (citing James G. Blaine, *Twenty Years of Congress: From Lincoln to Garfield* 531 n.1 (1886)). The inquiry apparently lasted a whole year. *Id.* Eventually the Senate refused to seat Vance, "and after fruitless efforts to have his disabilities removed, he resigned." Clement Dowd, *Life of Zebulon B. Vance* 218 (1897). Vance eventually did have his § 3 disability removed and was seated in Congress in 1879 where he served until his death. Magliocca, *supra*, at 111 n.126.[18] But the Vance saga proves that "the Senate accepted the premise that, if it chose, it could have removed the disabilities of Zebulon Vance after his election, a procedure that had been followed for officials elected by several other southern states." Butler & Wolff, *supra*, at 169.

In the early 20th century, Congress twice dealt with § 3 issues surrounding a socialist candidate from Wisconsin named Victor L. Berger. Berger was an avowed

---

[18] Interestingly, Vance served in the Thirty-fifth and Thirty-sixth Congresses. So he could not have received the general amnesty from the 1872 Amnesty Act, which specifically excluded amnesty for members of that Thirty-sixth Congress. *See* 17 Stat. at 142. I have been unable to find how Vance received that congressional removal of his disability.

socialist who was twice kept from taking his seat in the House of Representatives during the Red Scare. Edward J. Muzik, *Victor L. Berger: Congress and the Red Scare*, 47 Wisc. Mag. of Hist., no. 4, 1964, at 309–18. Berger was elected to the House of Representatives in 1918 in Wisconsin's Fifth District, but he was convicted of conspiracy to obstruct the country's efforts during the Great War just a few months later in January 1919. *Id.* at 310. When Berger presented himself to be seated in May 1919, another member challenged his right to be seated, which led to a trial in the House of his eligibility under § 3.[19]

During those debates, a House Report noted the following: "[T]here is a fourth qualification prescribed by the Constitution, or rather a fourth prohibition, as the qualifications set forth in the Constitution are put in negative form . . . Section 3 of the fourteenth amendment to the Constitution." 6 Cannon's *Precedents of the House of Representatives* ch. 157, § 56, at 55. In that discussion, there was disagreement about when Congress can exclude members for reasons beyond the textual disqualifications in the Constitution (remember, *Powell* is still fifty years away), but that Congress grounded their decision to exclude Berger in the text of the Constitution:

> While there has in the past been some opposition on the part of a small minority to the well established practice of the House of Representatives in excluding unfit persons from membership on the ground that the House has no right to add to the qualifications prescribed in the Constitution, in the present case it is perfectly plain that under the Constitution itself, if the House is satisfied that Representative-elect Berger did give aid or comfort to the enemies of the United States, he is ineligible to a seat in this House, and it is not only the right but the constitutional duty of the House to exclude him.

---

[19] Berger made some of the very same arguments that Representative Cawthorn made to the district court here, that some 19th century congressional enactments had removed the § 3 disability prospectively. Muzik, *supra*, at 312.

*Id.* ch. 157, § 57, at 58.

Berger was disqualified by a vote of 311 to 1. Lynch, *supra*, at 210. A special election was called, Berger won that special election, and again, Berger was denied his seat by Congress. *Id.*[20] Years later, Berger's criminal conviction was overturned by the Supreme Court. *Berger v. United States*, 255 U.S. 22, 36 (1921). So he ran yet again, won yet again, and was curiously seated by Congress in 1922 with no fuss and without a resolution removing the disability. Lynch, *supra*, at 213.

These congressional debates are messy. I don't mean to suggest otherwise. The members of these Congresses disagreed and often vigorously so. *See, e.g.*, H.R. Rep. 43-484, at 12 (1874) (views of minority) ("No other qualifications are prescribed in the Constitution," other than age, citizenship, and residency.). And as the *Powell* Court said, congressional practice is "limited" in its precedential value. 395 U.S. at 546. But against this congressional practice, the challengers have not cited, nor have I found, any example of a prior court purporting to determine the § 3 qualifications of a Member of Congress. That historical imbalance tracks my understanding that § 3 is a political question about the qualifications of Members-elect for office: "Each House"—and only each House—"shall be *the* Judge of Elections, Returns and Qualifications of its own Members." Art. I, § 5, cl. 1 (emphasis added). At the very least, I take this congressional practice as some

---

[20] Wisconsin put Berger on the ballot again, even though he had previously been excluded from Congress under § 3.

persuasive authority that other constitutional interpreters have looked at the text, context, and history of the Constitution and reached the same conclusion as I have here.[21]

Section 3 of the Fourteenth Amendment is a constitutional qualification for members of Congress. Thus, a federal court has no jurisdiction to determine a member's qualifications under § 3.

## IV. The district court's interpretation of the 1872 Amnesty Act was a "judging" of Representative Cawthorn's qualifications

To this point, I have shown that Art. I, § 5, cl. 1 of the Constitution deprives courts of jurisdiction to judge a candidate's qualifications for office under § 3 of the Fourteenth Amendment. To complete the circle of my argument, I now explain why the district court's opinion interpreting the meaning of the 1872 Amnesty Act as applied to Representative Cawthorn was necessarily a judging of his qualifications that falls into the jurisdictional restriction in Art. I, § 5, cl. 1.

---

[21] The challengers have argued here that it would be odd for Congress to be the sole arbiter of the § 3 issue when Congress readmitted North Carolina to the Union after the Civil War by an Act explicitly requiring the State to exclude insurrectionists from office. *See* An Act to admit the States of North Carolina, South Carolina, Louisiana, Georgia, Alabama, and Florida, to Representation in Congress, ch. 70, § 3, 15 Stat. 73, at 74 (June 25, 1868). That Act reads: "[N]o person prohibited from holding office under the United States, or under any State, by section three of the proposed amendment to the Constitution of the United States, known as article fourteen, shall be deemed eligible to any office in either of said States, unless relieved from disability as provided in said amendment." The challengers suggest that it would be strange for Congress to be the sole judge of the qualifications of candidates for office when it required North Carolina to hold insurrectionists ineligible for office. But this argument will not do. The Act focuses on state offices—"any office in either of said States"—not federal offices. So it would be strange to read this language about what states can do with their comptrollers and their sheriffs as evidence that Congress somehow intended to give up the power to determine the qualifications its own membership. Elephants and mouseholes.

Representative Cawthorn's claims under the 1872 Amnesty Act fall into the "scope of the textual commitment to the House to judge the qualifications of members." *Powell*, 395 U.S. at 519 n.40. In the words of Justice Douglas, this is a "contest . . . over whether an elected official meets the 'qualifications' of the Constitution." *Id.* at 552 (Douglas, J., concurring). The parties are contesting whether Representative Cawthorn meets the requirements of § 3 and that contest is covered by Art. I, § 5, cl. 1's commitment of this issue to the House. Admittedly, this issue is complicated by the fact that Representative Cawthorn called on the district court to interpret a statute, the 1872 Amnesty Act. He has not outright asked the district court to declare him qualified under § 3. *See* Maj. Op. 20. But the inevitable effect of any interpretation of the 1872 Amnesty Act here is to say what Representative Cawthorn's qualifications are, which amounts to an impermissible "judging" under Art. I, § 5, cl. 1.

It's useful to start by looking at what the district court did here. The district court's opinion determines the category of people benefited by the 1872 Amnesty Act and determines that Representative Cawthorn is among that group. The opinion then outlines potential exceptions from the benefit and determines that Representative Cawthorn does not fit those exceptions. And the opinion ends by concluding that the state board cannot "determine Plaintiff's qualifications" because the 1872 Amnesty Act has already answered that question, implying that the question of Cawthorn's qualifications has been definitively answered by the Act. In doing all that, the court "determine[d] facts and appl[ied] the appropriate rules of law," *Barry*, 279 U.S. at 613, a classic act of judging. All that

amounted to a judging of Representative Cawthorn's qualifications under § 3, which falls into the jurisdictional bar of Art. I, § 5, cl. 1.

With that said, the district court did what courts do around the country every day— interpret a statute. As the majority rightly says, statutory interpretation is the "bread-and-butter of judicial work." Maj. Op. 20. And in *Zivotofsky*, the Supreme Court held that deciding whether one party's interpretation of the statute is correct "is a familiar judicial exercise," that is less likely to be displaced by the political-question doctrine. 566 U.S. at 196. Deciding whether a statute is constitutional is also right in the judiciary's wheelhouse. *Id.* When a court is being asked to decide a question of interpretation—even where that question interacts with or otherwise affects a political question—the court is usually not deprived of jurisdiction. I concede that is true in the mine run of cases, but it is not true here.

"[I]n order to evaluate whether a case presents a political question, a court must first identify with precision the issue it is being asked to decide." *Id.* at 208–09 (Sotomayor, J., concurring). Precise framing of the question is crucial to determining whether something is inside or outside the area reserved for the sole jurisdiction of the designated political branch. If the question is simply whether a statute is constitutional, courts will not be barred from answering that familiar question.[22] But as Justice Sotomayor lays out in her

---

[22] To reiterate, I do not decide whether Representative Cawthorn's challenge to the constitutionality of North Carolina's statutory structure under Art. I, § 5, cl. 1 is a political question. Count III is not before this court yet. The determination of whether North Carolina's statutory scheme violates Art. I, § 5, cl. 1 has not yet been addressed by the district court and may well be within the power of federal courts. *See Powell*, 395 U.S. at (continued)

*Zivotofsky* concurrence, a "statute could give rise to a political question." *Id.* She offers a hypothetical statute "purporting to award financial relief to those improperly 'tried' of impeachment offenses." *Id.* at 209. That statute would ask courts to answer the very political question the Supreme Court refused to answer in *Nixon*: what "try" means in the Impeachment Clause. So while statutory claims are less likely to raise political questions, they are not exempt from the doctrine.

With full understanding that examples of the political-question doctrine are rare and that the doctrine's application to a statute is even rarer, the 1872 Amnesty Act is that rare case that requires a court to resolve a political question—the qualifications of the members of Congress. As I have said, any attempt by the district court or by this court to determine the effect of the Act as applied to Representative Cawthorn would have to be a judging of his constitutional qualifications for office. All the Act does is purport to remove the § 3 disability from a certain group of people; it is the real-life example of Justice Sotomayor's hypothetical, a statute that codifies a political question committed to Congress. And Representative Cawthorn is asking the district court to determine the effect of that Act on his qualifications. Representative Cawthorn is not asking the court to consider the constitutionality of the statute as in *Zivotofsky*; he asks the court to say what the Act means for him. *See* Compl.17 ("the 1872 Act removed the ability to apply Section Three to Rep. Cawthorn"). Nor does Representative Cawthorn ask the Court to determine whether the Act somehow changed the list of constitutional qualifications. *See id.* at 16 (conceding that

---

519 n.40. I only discuss the narrow question of whether the district court may judge Representative Cawthorn's qualifications by way of interpreting the 1872 Amnesty Act.

the 1872 Amnesty Act did not "repeal" § 3). Representative Cawthorn's Complaint instead argues that the 1872 Amnesty Act "removed the ability to apply Section Three" to him. *Id.* at 17. Resolving the meaning of the Act for Representative Cawthorn's case would require us to determine whether any § 3 disability has been removed from him, which reaches beyond our jurisdiction into a political question, statutory interpretation or not.

As above, it also helps to take a step back and consider this issue under more mundane jurisdictional principles. It is, in fact, not that rare for a statute itself to provide a "textually demonstrable commitment" of an issue to another branch through something like a jurisdiction-stripping provision. When Congress itself says in a statute that courts have no jurisdiction over some question committed to another branch, that means we don't have jurisdiction, even when the question would involve statutory interpretation. *See, e.g.*, *Patel v. Garland*, No. 20-979, 2022 WL 1528346 (U.S. May 16, 2022) (discussing 8 U.S.C. § 1252(a)(2)(B)(i), which takes away federal courts' jurisdiction to review the executive's factual determinations in relief-from-removal proceedings under § 1255). The *Zivotofsky* court is surely right that it is rarer for a court to be deprived of jurisdiction to interpret a statute when the bar on jurisdiction comes from outside the statute and instead from the Constitution. The Constitution seldom deprives federal courts of the ability to hear federal questions. But this case is just such an example. The Act here directly invokes the last sentence of § 3 of the Fourteenth Amendment, an area which is, as I have explained, left for the sole review of each House of Congress. Beyond simply referencing § 3, the Act quotes the language of § 3, it notes that it has met the appropriate vote threshold required by § 3 ("two-thirds of each house concurring therein"), and it calls itself "An Act to remove

71

the political Disabilities imposed by the fourteenth Article of the Amendments of the Constitution of the United States."  17 Stat. 142.  Representative Cawthorn asks us to answer a question over which only the House of Representatives has jurisdiction, the qualifications of a House Member.

The majority makes one other argument along these lines that needs answering.  The majority tries to split up the issues:  "the question before us is: *Regardless* of whether Section 3 would otherwise disqualify Representative Cawthorn, does the 1872 Amnesty Act nevertheless authorize him to serve?"  Maj. Op. 20.  Perhaps there are two separable issues here—disqualification under § 3 and, as the majority puts it, authorization to serve under the Act.  But that can't be.  Judging whether the Act "nevertheless authorize[s] him to serve" is by definition judging his qualifications.  Determining whether a disqualification was later removed is no less a judging than determining whether the disqualification attached in the first place.  And anyway, the "authorization" framing muddles the issue.  By the express terms of § 3, there are two ways to avoid disqualification:  (1) don't rebel or give comfort to the enemy in the first place or, if you can't manage that, (2) get Congress to vote by a 2/3 majority to remove your disability.  The only thing that could "nevertheless authorize him to serve" is if Congress had removed the disability—in other words if he had satisfied one of the possible ways to meet the § 3 requirement.  That is a determination for Congress to make, and for Congress *alone* to make.  Not us.  Not the district court.

*        *        *

The only actor in our American constitutional system that can judge the qualifications of members of the House of Representatives is the House of Representatives

itself.  That restriction restrains the jurisdiction of federal courts—the very power of the courts to consider the question.  The judging of congressional qualifications—or the qualification of candidates—is a political question committed exclusively to each House of Congress.  This court cannot do it.  The district court cannot do it.  Only the appropriate House of Congress can.  Section 3 of the Fourteenth Amendment lays out one such qualification.  When pulled together, these principles deprive courts of jurisdiction over the question here.

When the district court here tried to determine the effect of the 1872 Amnesty Act on Representative Cawthorn's qualification for access to the ballot, the attempt amounted to a judging of his qualifications for office.  The district court had no jurisdiction to make that call.  Therefore, I would vacate the lower court's injunction and remand for further proceedings on Representative Cawthorn's remaining claims.